IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| ALTERA INFRASTRUCTURE L.P., *et al.*, | § § § § | Case No. 22-90130 (MI) |
| Debtors.[1] | § § § § | (Jointly Administered) |

**OBJECTION OF AD HOC GROUP
OF TOPCO NOTEHOLDERS TO EMERGENCY MOTION
FOR INTERIM ORDER APPROVING POST-PETITION FINANCING**

The Ad Hoc Group of TopCo Noteholders (the "Ad Hoc Group" or the "TopCo Noteholders")[2] respectfully submits this objection to the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Scheduling a Final Hearing* [Dkt. 18] (the "Brookfield DIP Motion"), and states as follows[3]:

**Introduction**

1. Late last night (Saturday night), the Debtors filed an RSA for a plan of reorganization under which the TopCo Noteholders would receive virtually no recovery. By

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Altera. The location of Debtor Altera Infrastructure L.P.'s principal place of business and the Debtors' service address in these chapter 11 cases is Altera House, Unit 3, Prospect Park, Prospect Road, Arnhall Business Park, Westhill, AB32 6FJ, United Kingdom.

[2] Members of the Ad Hoc Group include funds or accounts managed by the following entities or their affiliates: Blackrock Financial Management, Inc., Capital Research and Management Company, CastleKnight Management LP, CI Investments Inc., Manulife Investment Management (US) LLC and Manulife Investment Management Limited, Mesirow Financial Investment Management, Inc., and SSGA Trust Company.

[3] Capitalized terms not defined have the same meanings as in the Brookfield DIP Motion.

US 9163526

contrast, pursuant to the RSA, the Debtors' private equity sponsor — Brookfield — will maintain close to 100% of the equity in the reorganized company on account of claims that, less than a year ago, were identical to those of the TopCo Noteholders.

2.  The differential treatment is based on a preferential, insider transaction that Brookfield orchestrated in August 2021. Through that transaction, described below, Brookfield's notes (and only Brookfield's notes) were repaid using value that formerly belonged to Altera Parent and all its unsecured noteholders.

3.  Prior to the filing of the DIP Motion (also late on Saturday night), the TopCo Noteholders did not intend to object to the Debtors' first day relief. In the DIP Motion, however, the Debtors have sought interim relief — in connection with a DIP financing from Brookfield that is expressly designed to facilitate Brookfield's retention of control over Altera — that would severely impair the ability of an official committee and other creditors to scrutinize the proposed plan and Brookfield's conduct, including the August 2021 transaction.

4.  In particular, in connection with emergency *interim* approval of post-petition financing, Altera wants to impose an arbitrary, short-term deadline to pursue causes of action against Brookfield, and to limit the committee investigation budget to just $100,000. Altera also wants to provide Brookfield with sweeping releases upon entry of the final DIP order — outside of a plan, regardless of the committee's position, and before the committee and others have reasonable time for investigation. Those extraordinary provisions should not be permitted in an interim order, especially in the circumstances presented, where the DIP lender is a sponsor looking to retain control and to obtain releases relating to highly consequential transactions.

5.  For purposes of this objection, the key facts are as follows: Altera is a portfolio company of Brookfield. Brookfield owns substantially all of Altera Parent's common equity.

2

Altera Parent in turn owns 100% of the equity of the debtor Altera Infrastructure Holdings, L.L.C. ("Holdings"), and Holdings holds the equity of substantially all of the entities that operate Altera's global offshore oil and gas services business.

6. Altera Parent's only material indebtedness consists of senior unsecured notes and unsecured guarantees of certain subsidiary-level debt. As of August 2021, Brookfield owned around 60% of those unsecured notes, approximately $411 million in principal amount. The remaining 40%, approximately $276 million, were held by non-insider noteholders, including members of the Ad Hoc Group.

7. In August 2021, in the face of financial distress at Altera, Brookfield decided that Altera Parent should repay Brookfield's approximately $411 million in unsecured Altera Parent notes with secured notes issued by Holdings. Material value of Altera Parent was thereby diverted to those new Holdings notes, which were used to repay Brookfield.

8. In the First Day Declaration, the Debtors' Chief Financial Officer seeks to justify the exchange transaction on the basis that non-insider noteholders had the opportunity to participate on terms "substantially similar" to those Brookfield received. *See* Steinsland Decl. ¶ 55. That testimony is incorrect. The terms were not substantially similar.

9. Among other differentiators, Brookfield was contractually precluded from voting the original Altera Parent notes — a necessary protection given Brookfield's conflicted sponsor status. By contrast, when Brookfield was repaid with the new Holdings notes, the new notes not only permitted Brookfield to vote, but also provided Brookfield with control over the exercise (or

3

non-exercise) of remedies against *its own portfolio company*.[4]  Most noteholders rejected that offer rather than agree to standstill indefinitely from and after the closing of the transaction.

10. The Debtors' CFO also declares that, at the time of the exchange, Altera "did not receive feedback or input" from non-insider noteholders.  *Id*. ¶ 56.  In fact, as shown by contemporaneous emails, holders sought to engage with Altera (including its CFO) regarding the exchange.  After initially agreeing to engage, Altera and Brookfield declined to speak with the holders.  Citi, as dealer-manager, likewise refused to discuss any changes to the deal.  So the deal closed, with neither Altera nor Brookfield ever engaging on the problematic terms.  The Debtors' CFO acknowledges that Brookfield did not in the end permit *any* non-insiders to exchange: the 30% of non-insider noteholders that tried to accept Brookfield's coercive deal were not allowed to exchange, due to a Brookfield-imposed participation threshold.  *Id*.

11. In these chapter 11 cases, a central issue will be whether Brookfield — the Debtors' equity sponsor — should be allowed to retain the benefits of the August 2021 exchange, under which it procured repayment of its own notes through issuance of new, purportedly senior secured notes.  Another central issue, related to the first issue, will be whether Altera Parent and its estate

---

[4] The coercive, preferential aspects of the transaction were disclosed in Altera's Offering Memorandum for the Exchange, which stated that Brookfield entities, as the "Required Secured Parties," would have the following rights, among others:

(i) to direct the collateral trustee to enforce or exercise (or to refrain from enforcing or from exercising) any remedies on the Collateral; (ii) to adjust or settle any insurance policy or claim covering or constituting Collateral in the event of any loss; (iii) to allow or prevent any amendments to the security agreements and documentation affecting the Collateral; and (iv) to authorize the collateral trustee to credit bid all or any portion of the obligations secured by the Collateral, to consent to debtor-in-possession financings secured by the Collateral and to take certain other actions in bankruptcy.  *The Brookfield Holders and their affiliates, as both the sponsor of the Partnership and as holders of the majority of the outstanding New PIK Notes, may have interests in such actions that do not align with those of unaffiliated noteholders, and may agree to actions thereunder that are adverse to the interests of such unaffiliated noteholders.*

Altera, Offer to Exchange Any and All 8.50% Senior Notes Due 2023 (July 29, 2021) at 22 (emphasis added).

fiduciaries can in good faith defend and prosecute a plan (of the kind embedded in the RSA and Brookfield's DIP) that provides minimal value, through warrants, to non-insider noteholders while providing the sponsor Brookfield with 100% of the new equity.  Valuation issues, as well as issues relating to Brookfield's asserted claims (including a large make-whole), will also be front and center.[5]  To address all of those issues, an Official Committee of Unsecured Creditors will need to conduct a thorough investigation of the August 2021 exchange and the proposed RSA.  Discovery will be needed from Brookfield and Altera.  Insider releases will require careful scrutiny, and causes of action will need to be pursued or resolved.

12. At this stage, rather than litigating any of the issues referenced above, the TopCo Noteholders are simply trying to ensure that nothing happens on the first day of this case that changes the status quo to their detriment.  Unfortunately, the interim relief sought in the DIP Motion *would* change the status quo, and in profound ways.  Contrary to Paragraph 8(i) of this Court's *Procedures for Complex Cases*, which requires an "extraordinary showing" to obtain approval of a "provision that limits the ability of estate fiduciaries to fulfill their duties," the proposed interim order (including but not limited to Paragraph 28) would — at the very outset of the case — curtail and cut off an official committee's ability to investigate highly significant conflict transactions that benefited Brookfield.

13. The Interim DIP Order should not be entered in the form presented.  It should be revised to take out the provisions that would release claims against Brookfield on a very short timeline (outside a plan) and severely curtail the committee's ability to fulfill its duties in

---

[5] The Ad Hoc Group reserves all rights with respect to valuation, including the value of the enterprise and of Altera Parent (regardless of whether the August 2021 repayment is given effect).  The Ad Hoc Group is continuing to conduct diligence regarding valuation issues and expects that the official committee will conduct such diligence as well when it is appointed.

investigating and pursuing claims. No relief should be granted now with respect to releases, challenge periods, investigation budgets, limitations on estate fiduciary actions, and the proposed roll-up and milestones. Those issues should be addressed and decided on fair notice and a fair record after a committee is appointed.

## **OBJECTION**[6]

14. This is not a standard case involving releases or challenge periods in DIP financing arrangements. Brookfield, the proposed DIP lender, is not the typical third-party lender. Brookfield is Altera's private equity sponsor, its common equity owner, and the largest purported creditor. The Debtors have agreed to an RSA under which Brookfield will continue to own substantially all of reorganized Altera. Brookfield seeks to fund this DIP Facility for the principal purpose of paying the expenses needed to implement a plan under which Brookfield would maintain its equity ownership and obtain sweeping releases.

15. The DIP, moreover, is in large measure being advanced to provide the company with a "cushion" rather than to meet immediate cash needs. Under the DIP budget, the Debtors plan to draw $25 million in the near term, but will use at most a fraction of that amount. Most of the cash will sit on the balance sheet. As for the additional $25 million that will depend on a final order, the DIP Budget suggests that the Debtors will need that additional amount only as they approach emergence, if ever. Accordingly, the Debtors and Brookfield could choose to operate under the "interim" order — waiving the final order milestone — for a significant period of time. In that circumstance, the interim order would control (unless vacated).

---

[6] Given the exceptionally short time that the Ad Hoc Group has had to review the DIP Motion and related documents (which were filed after 10 p.m. Central on Saturday evening before an 8 a.m. Monday hearing, and were not provided to the Ad Hoc Group in advance of their public filing), the Ad Hoc Group reserves all rights to advance further objections at the hearing or otherwise.

US 9163526

16. As explained above, the factual background here is also extraordinary. The DIP financing here is stapled to a chapter 11 plan that (if approved) would allow Brookfield, Altera's equity sponsor, to retain 100% control of Altera while non-insiders noteholders receive little or nothing. As part of the same plan, Brookfield would receive a broad release, including of all claims associated with the August 2021 transaction, in which Brookfield procured repayment of its parent-level notes by providing itself with purportedly senior secured claims. That transaction cries out for a robust, committee-led investigation, so that causes of action can be developed and pursued (or settled), and non-insider creditors can have a fair process.

17. Despite those facts, through the Interim Order, Brookfield and Altera are seeking to cut off the chapter 11 process before it even begins. In exchange for limited financing (up to $25 million in the near term, most of which is not budgeted to be spent), Brookfield wants to prevent an official committee from spending more than $100,000 on investigations, and to require that the Court grant it a *complete release* at the final DIP hearing, to be held within weeks. It is almost as if the Debtors used the list of provisions that Paragraph 8 of this Court's *Procedures for Complex Cases* disfavor on an emergency basis as an instruction manual for how to protect Brookfield on the first day. The most objectionable provisions are outlined below.

18. ***Releases and Challenge Deadlines***. Paragraph 28(d) of the proposed Interim Order provides that the "Challenge Deadline" for an Official Committee would be set at 60 days from the formation of the committee, and the deadline for other parties would be 75 days from the interim order date. Notably, that 60- or 75-day period is not the deadline to file a standing motion. Instead, under Paragraph 28(a) of the proposed Interim Order, the committee or other challenger has to *obtain* the "requisite standing" and "commence" an action by the Challenge Deadline, and then obtain a "final non-appealable order" in its favor "sustaining" the challenge. Thus, to avoid

7

the automatic release of claims, a committee would have to take all necessary discovery, file a successful standing motion and then file a suit within 60 days of its formation. And the releases would be effective unless and until there is a final, non-appealable order sustaining the claims.

19. Crucially, even the 60- and 75-day challenge periods are in this case illusory, because Paragraphs 28(d) and 28(f) of the Interim Order provide that the Challenge Deadline applicable to the "Prepetition IntermediateCo Secured Parties" — namely Brookfield — "shall automatically be deemed to have lapsed" on the "*earliest*" of several dates, with one of the dates being "the date of entry of the Final Order." Interim Order ¶¶ 28(d), 28(f). Thus, despite the requirement in Paragraph 9 of the *Procedures for Complex Cases* that the committee be given at least 60 days to investigate, and that the 60 days must be subject to extension by the Court, the Debtors and Brookfield seek to cut off the challenge period and obtain a complete release for Brookfield at the final DIP hearing — weeks into the case, not long after committee appointment, and prior to meaningful investigation. *See* Brookfield DIP Motion ¶ 61. The final DIP hearing, in other words, is being set up as a hearing to procure critical insider releases *outside of a plan*, apparently in exchange for the limited secured financing Brookfield is providing to protect its own economic interests and control position.[7]

20. None of that should be approved. Given the nature of the transactions at issue, and the self-evident need for investigation by an official committee, the committee and other creditors should not be put in a position on day 1 where they have no time for necessary investigation. They also should not be put in a position where they need to file *and win* a standing motion to prevent releases from taking effect. Nor should the committee and others be in a position where the final

---

[7] The DIP Facility contains a milestone requiring entry of the Final Order 45 days after the Petition Date. So the Debtors and Brookfield are angling for a complete release of Brookfield just several weeks after appointment of the committee.

DIP hearing (to be held within 45 days) will be a premature release hearing that preempts the challenge and plan processes. Rather than approving any of those restrictions at this time, the official committee and other parties-in-interest should have an opportunity to present argument and evidence, at a later date, regarding the time and effort needed for a thorough investigation.

21. ***Investigation Budget***. Paragraph 24 is likewise objectionable in setting an investigation budget of $100,000 for the committee's investigation of Brookfield, and even that $100,000 cannot be used to "prepare, initiate, litigate, prosecute, object to, or otherwise challenge, (i) the claims and liens of the Prepetition Secured Parties and (ii) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties." (Again, Prepetition Secured Parties means Brookfield.) This is another departure from this Court's *Procedures for Complex Cases* (¶ 8.g), which specifically bars "[l]imitations on the use of cash collateral or DIP proceeds (other than general 'carve-outs') to pay approved fees and expenses of advisors to official committees or future trustees," at least absent an extraordinary showing (of which none has been made).

22. Beyond that, $100,000 will not remotely suffice for the investigation that is appropriate here. That amount will not come close to covering the document discovery, interviews or depositions, and other process that will be required. Again, rather than determining the appropriate budget at an emergency hearing, the budget should be determined at a later time with the committee's input, based on facts and evidence regarding the issues to be investigated and the work that will be needed. That is especially true given that, based on the DIP Budget, the Debtors will not need additional funding (beyond the $25 million sought in the interim order) for many months, if ever. If Brookfield opts to defer the final hearing, the committee could be hamstrung by a plainly inadequate budget imposed on the first day, before it was appointed.

23. ***Roll-Up***.  Brookfield seeks to roll-up at the *interim* order stage $20 million of outstanding loans, in exchange for at most $25 million of new money on an interim basis.  Interim DIP Order ¶ H.(vi).  In addition, the Debtors would be bound to pay a $3 million exit fee at emergence on account of the rollup, which fee would potentially further dilute unsecured creditor recoveries.  This is at odds with Paragraph 8(c) of this Court's *Procedures for Complex Cases*, which requires an extraordinary showing for "[r]oll ups (including (i) provisions deeming pre-petition debt to be post-petition debt; and (ii) provisions requiring the proceeds of post-petition loans to be used to repay pre-petition debt)."  No extraordinary showing has been made.  If the roll-up truly does not "prejudice any stakeholders," DIP Motion ¶ 47, that portion of the DIP Motion can be heard on a final basis after stakeholders have had time to review and understand the relief being sought and its implications (including the exit fee).

24. ***Milestones***.  Paragraph 8.a. of this Court's *Procedures for Complex Cases* limits approval of "[s]ale or plan confirmation milestones," again requiring an extraordinary showing.  Brookfield and the Debtors seek to impose, among other milestones, (1) Interim DIP Approval within five days, (2) Final DIP Approval within 45 days, (3) disclosure statement approval within 90 days and (4) plan *consummation* within 120 days.  Those milestones are mirrored by the DIP's Maturity Date, which at the latest is December 10, 2022 — 120 days after the Petition Date.

25. Just as the other provisions discussed above should not be approved on an emergency basis, approval of the milestones should not occur now.  The milestones on their face appear unreasonable and designed to jam parties, including the non-insider noteholders, that have not agreed to the RSA and are not aligned with Brookfield.  The milestones also do not provide time for the committee investigation that will be necessary in light of the transactions discussed

above and the proposed plan.  Again, such substantive relief that will dictate the course of the case should await appointment of a committee and a full and fair hearing.

26. **Estate Fiduciary Limitations**.  Paragraph 33(a) of the Interim DIP Order purports to bind any successor to the debtor or any future estate representative (including a future trustee) to the Debtor's stipulations in favor of complete releases of Brookfield.  The debtor-in-possession may be able to bind itself, but it is inappropriate to include a provision "that limits the ability of [not-yet-appointed] estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law" on an interim or emergency basis.  Procedures for Complex Cases ¶ 8.i.

27. For those reasons, the Court should not enter the Interim Order absent removal or modification of the proposed provisions relating to releases, challenge deadlines, the committee's budget, limitations on estate fiduciary actions, and the proposed roll-up and milestones.  Approval of those provisions, at a first day hearing on virtually no notice, would be inconsistent with the need for a full and fair process that is not run for the primary benefit of the Debtors' controlling insider, Brookfield.

[*Remainder of Page Intentionally Left Blank*]

US 9163526

Dated: August 14, 2022

Respectfully submitted,

*/s/ Paul E. Heath*
**VINSON & ELKINS LLP**
Paul E. Heath (TX 09355050)
Matthew W. Moran (TX 24002642)
Trevor G. Spears (TX 24106681)
845 Texas Tower, Suite 4700
Houston, Texas 77002
Telephone: (713) 758-2222
pheath@velaw.com
mmoran@velaw.com
tspears@vwelaw.com

-and-

**WACHTELL, LIPTON, ROSEN & KATZ**
Emil A. Kleinhaus (*pro hac vice* pending)
Michael S. Benn (*pro hac vice* pending)
Benjamin S. Arfa (*pro hac vice* pending)
Michael H. Cassel (*pro hac vice* pending)
Stephanie A. Marshak (*pro hac vice* pending)
51 West 52nd Street
New York, New York 10019
Telephone: (212) 403-1000
eakleinhaus@wlrk.com
msbenn@wlrk.com
bsarfa@wlrk.com
mhcassel@wlrk.com
samarshak@wlrk.com

**COUNSEL TO THE AD HOC GROUP OF TOPCO NOTEHOLDERS**

**CERTIFICATE OF SERVICE**

      I certify that on August 14, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                                   */s/ Trevor G. Spears*
                                                   One of Counsel