IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| ALTERA INFRASTRUCTURE L.P., *et al.*,[1] | Case No. 22-90130 (MI) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF JAN RUNE
STEINSLAND, CHIEF FINANCIAL OFFICER
OF ALTERA INFRASTRUCTURE GROUP LTD.,
IN SUPPORT OF CONFIRMATION OF THE THIRD
AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
OF ALTERA INFRASTRUCTURE L.P. AND ITS DEBTOR AFFILIATES**

I, Jan Rune Steinsland, hereby declare under penalty of perjury:

**Background and Qualifications**

1. I am the Chief Financial Officer of Altera Infrastructure Group Ltd., a limited liability company organized under the laws of the Marshall Islands, and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors," and together with their direct and indirect subsidiaries, "Altera"). I have served in my current position since 2018 and have close to 30 years of experience in the energy and offshore oil and gas industries. I hold a master's degree equivalent in business from the University of St. Gallen, Switzerland. Prior to joining Altera, I served as Chief Financial Officer at drilling contractors Songa Offshore SE (from 2013 to 2018) and Ocean Rig (from 2006 to 2013). Before that, I was the Chief Financial Officer for the financial

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' Claims and Noticing Agent at https://cases.stretto.com/Altera. The location of Debtor Altera Infrastructure L.P.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is Altera House, Unit 3, Prospect Park, Prospect Road, Arnhall Business Park, Westhill, AB32 6FJ, United Kingdom.

group Acta Holding ASA (from 2000 to 2006). From 1988 to 2000, I served in various management roles at ExxonMobil. From 1986 to 1988, I worked for IBM.

2. I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I am also familiar with the Debtors' supply chain and the status of the Debtors' relationships with various vendors, suppliers, and service providers.

3. I submit this declaration (this "Declaration") in support of confirmation of the *Third Amended Joint Chapter 11 Plan of Reorganization of Altera Infrastructure L.P. and Its Debtor Affiliates* [Docket No. 516] (as modified, amended, or supplemented from time to time, the "Plan").[2] Except where specifically noted, the statements in this Declaration are based upon: (a) my personal knowledge of the Debtors' operations, business affairs, financial performance, and restructuring efforts; (b) information learned from my review of relevant documents; or (c) information I have received from other members of the Debtors' management or the Debtors' advisors. If I were called upon to testify, I would testify to the facts set forth herein.

## The Proposed Restructuring

### A. The Restructuring Transactions.

4. The Debtors commenced these Chapter 11 Cases less than three months ago with the goal of re-profiling their secured credit facilities to better align vessel-level cash flows with debt-service obligations and secure the liquidity necessary to achieve long-term operational sustainability. The Debtors' capital structure and liquidity issues resulted in large part from declining revenues brought on by market headwinds, expiration of key contracts, and the inability

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan or the *Third Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Altera Infrastructure L.P. and Its Debtor Affiliates* [Docket No. 441] (the "Disclosure Statement"), as applicable.

to redeploy certain vessels. A mismatch between operating cash flows and the cost of the Debtors' ongoing debt-service payments further exacerbated these challenges.

5. Faced with these challenges, the Debtors worked proactively over the course of this year to build consensus with the holders of their funded-debt obligations on the terms of a comprehensive balance-sheet restructuring. These discussions ultimately culminated in the execution of (a) the Restructuring Support Agreement, with the support of Brookfield Business Partners L.P. (together with its affiliates, "Brookfield") and Bank Lenders holding approximately 99% of outstanding vessel-level secured debt; and (b) the Noteholder Plan Support Agreement, with the support of Brookfield and noteholders representing approximately 65.7% of the outstanding Altera Unsecured Notes Claims. This broad consensus has allowed the Debtors to obtain immediate access to critical financing and to implement a comprehensive restructuring transaction that will enable an efficient and successful emergence from these Chapter 11 Cases.

6. The Plan will deleverage the Debtors' balance sheet by equitizing more than $1 billion in junior debt obligations, pay administrative and priority claims in full, render general unsecured claims at subsidiary Debtors unimpaired, and provide holders of Altera Unsecured Notes with a meaningful recovery in the form of their pro rata share of 13% of the New Common Stock (subject to dilution on account of the Management Incentive Plan, the New Warrants, and an equity rights offering), and subscription rights to participate in up to $12.55 million of the New Common Stock offered pursuant to the equity rights offering. Further, the Plan transactions will repay, through the equity rights offering, the $70 million DIP Facility and the remaining $12 million IntermediateCo RCF upon emergence and will raise up to an additional $12.55 million in cash. As a result, the Plan enables the Debtors to emerge from chapter 11 as a stronger, better-capitalized enterprise.

### B. The Equinor Contract.

7.  The Debtors have negotiated for many months with Equinor UK Limited ("Equinor") as operator on behalf of Equinor's partners in the Rosebank Field (located west of the Shetland Islands in the North Atlantic), certain Bank Lenders, and others towards the execution of a substantial bareboat charter (the "Equinor Contract") in respect of the floating production storage and offloading vessel known as the Petrojarl Knarr FPSO (the "Knarr Vessel"), which is the Debtors' most significant asset. The parties are in the process of finalizing the remaining material terms of the Equinor Contract and believe that the Equinor Contract will be in its final and agreed format before the Debtors' targeted emergence date. Among other terms, the final form of the Equinor Contract is expected to include the purchase options providing Equinor certain rights to purchase the Knarr Vessel on certain terms and conditions as set out in Clause 32 and the liquidated damages sum set out in the definition of "Purchase Option Default Termination Sum" and Clause 40.7(b) (in each case subject to agreement/finalization following further discussions before the Debtors' emergence date). The latest draft of the Equinor Contract was filed as part of the Plan Supplement.

8.  An executed Equinor Contract, and the projected cash flows thereunder, is an important component of the Debtors' restructuring. To obtain the benefits of the Equinor Contract, the Debtors must complete significant upgrades, which include life extensions, to the Knarr Vessel itself. Approximately $183 million of the cost of the upgrades will be funded by the Debtors. The amounts that the Debtors will fund have been committed by Brookfield and certain of the Bank Lenders under the terms of the Restructuring Support Agreement, with the remaining costs funded by Equinor. "First oil" under the Equinor Contract, at which time the Knarr Vessel is expected to begin generating cash again, is not expected until late 2026. Thus, while the Debtors expect cash flows from the Equinor Contract to be substantial, securing a definitive contract and bridging the

period that the Knarr Vessel would spend in layup undergoing upgrades—and securing the financing for the cost of those upgrades—was a key focus of Altera's discussions with Brookfield and the Bank Lenders.

9. The Equinor Contract is the product of arm's length negotiations, the projected cash flows thereunder are a material component of the Debtors' projections and will help to facilitate the Debtors' overall restructuring, and the Debtors have secured sufficient financing to fund all necessary upgrade costs. For these reasons, the Debtors submit that executing the Equinor Contract and undertaking the obligations therein is a valid exercise of their business judgment.

### The Plan Is Feasible Under Section 1129(a)(11) of the Bankruptcy Code

10. I understand that for a plan of reorganization to be confirmed pursuant to chapter 11 of the Bankruptcy Code, the Plan must satisfy the feasibility requirements set forth in section 1129(a)(11) of the Bankruptcy Code. I do not believe that confirmation is likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors. In connection with proposing the Plan and presenting the Plan to the Court for confirmation, the Debtors concluded that they will be able to meet their respective obligations under the Plan and to continue as a going concern without the need for further financial restructuring.

11. The Debtors' management team worked closely with FTI Consulting, Inc. and Evercore Group L.L.C. to prepare projections of the Reorganized Debtors' financial performance for 2023 through 2027, which are attached to the Disclosure Statement as <u>Exhibit F</u> (the "<u>Financial Projections</u>"). The Financial Projections are based on certain assumptions and are consistent with the facts as I understand them to exist today. While certain assumptions and facts may change in the future, I believe that the analyses and assumptions employed are reasonable as of today. As described in additional detail in the Financial Projections, the management team

prepared the Financial Projections on a consolidated basis, using an approach that is generally consistent with how the Debtors have historically prepared their projections, and with reference to historical operating performance, current and expected contracts, and operating costs. The Financial Projections are based on, among other things, the potential future performance of the Reorganized Debtors' operations, the implementation of the Plan in accordance with its terms, and anticipated consummation of the Plan in December 2022. The Debtors anticipate that they may experience fluctuations in their cash flows from time to time that may drive increases or decreases in liquidity. To the extent that the Debtors' liquidity decreases as a result of these events, the Debtors have ways to address such decreases.

12. I believe that the Financial Projections demonstrate that the Reorganized Debtors will be able execute their business plan, service their significantly reduced debt obligations, and successfully operate their businesses. By better aligning remaining debt maturities with expected cash flows, and significantly reducing cash debt interest expense, the Plan will provide the Reorganized Debtors with an improved liquidity profile and an improved ability to hit their operational targets and achieve the financial results contemplated in the Financial Projections. Accordingly, I believe that the Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code as it is not likely that the Debtors will liquidate or need further financial reorganization.

**Good Cause Exists to Waive the Stay of the Confirmation Order**

13. I understand that any stay of an order confirming a chapter 11 plan may be waived for good cause.

14. The Debtors' prompt emergence from chapter 11 is an important component of their restructuring by demonstrating to their counterparties and the market that they will rapidly and smoothly exit from this restructuring process and be a stable and reliable business going

forward. Delaying the effectiveness of confirmation of the Plan at this juncture (particularly in light of the high level of consensus among impaired creditors) would be prejudicial to all parties in interest that continue to incur the cost and expense of the Debtors' Chapter 11 Cases and could disrupt relationships with key stakeholders including, among others, the Debtors' customers and vendors. Therefore, I believe that there are good reasons to waive any stay imposed by the Bankruptcy Rules so that the proposed order confirming the Plan may be effective immediately upon its entry.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Dated: November 3, 2022              */s/ Jan Rune Steinsland*
                                                                          Jan Rune Steinsland
                                                                          Chief Financial Officer
                                                                          Altera Infrastructure Group Ltd.