**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ALTERA INFRASTRUCTURE L.P., *et al.*,[1] | ) Case No. 22-90130 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DECLARATION OF CAROL FLATON
IN SUPPORT OF CONFIRMATION OF THE THIRD
AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
OF ALTERA INFRASTRUCTURE L.P. AND ITS DEBTOR AFFILIATES**

I, Carol Flaton, hereby declare under penalty of perjury as follows:

**Background and Qualifications**

1.      Since March 10, 2022, I have served as a disinterested director of the board of directors (the "Board") of Altera Infrastructure GP L.L.C. ("Altera GP") and a member of the restructuring committee of the Board (the "Restructuring Committee").  I have over 30 years of experience in banking and finance, transformation and restructuring, and governance and risk management.  I hold a Bachelor of Science in Business Administration from the University of Delaware and a Masters in Business Administration from the International Institute of Management Development in Lausanne, Switzerland.  I have provided financial advisory services and have served as an independent director for both public and private companies, including Talen Energy Supply, LLC, Speedcast International Ltd., EP Energy Corp., and Jupiter Resources, Inc.

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' Claims and Noticing Agent at https://cases.stretto.com/Altera.  The location of Debtor Altera Infrastructure L.P.'s principal place of business and the Debtors' service address in these chapter 11 cases is Altera House, Unit 3, Prospect Park, Prospect Road, Arnhall Business Park, Westhill, AB32 6FJ, United Kingdom.

2.      I was previously a Managing Director of AlixPartners (f/k/a Zolfo Cooper, LLC) ("AlixPartners") where I specialized in restructurings and turnarounds.  While at AlixPartners, I advised creditors in the sovereign restructuring of the Commonwealth of Barbados, represented the official committees of unsecured creditors in the Title III filings related to the Commonwealth of Puerto Rico, served as the Chief Restructuring Officer and Strategic Director of Finance for Cetera Financial Group, and served as the Chief Restructuring Officer for Doral Financial Corporation.

3.      Prior to joining AlixPartners in 2014, I was a Managing Director in the restructuring practice of Lazard Ltd. (f/k/a Lazard Frères & Co.) ("Lazard").  At Lazard, I advised debtors, creditors, and equity holders engaged in restructurings, debt exchanges, 363 sales, acquisitions, refinancings, and capital raises.  Prior to Lazard, I was a Managing Director at both Credit Suisse First Boston and Citigroup Inc., where I was responsible for distressed positions in the banks' portfolios as well as being a senior member of the risk management teams.

4.      In my capacity as a disinterested director, I have become familiar with the Debtors' day-to-day operations, business, financial affairs, and books and records.

5.      I submit this declaration (this "Declaration") in support of confirmation of the Plan and the Debtor Release (as defined below) contained therein.[2]  Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with members of the Debtors' management team and the Debtors' other advisors, along with my review

---

[2]   Capitalized terms used but not defined herein have the meanings ascribed to them in the *Third Amended  Joint Chapter 11 Plan of Reorganization of Altera Infrastructure L.P. and Its Debtor Affiliates* [Docket No. 516] (as modified, amended, or supplemented from time to time, the "Plan") or the *Third Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Altera Infrastructure L.P. and its Debtor Affiliates* [Docket No. 441] (the "Disclosure Statement"), as applicable.

of the relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives.

6.     If called upon to testify, I would testify to the facts set forth herein.

### Appointment to the Board and Restructuring Committee

7.     In connection with analyzing its balance sheet and Altera's go-forward financial stability, the Board established the Restructuring Committee on March 10, 2022 to, among other things, explore, review, evaluate, and negotiate strategic restructuring alternatives.  The Debtors appointed me as a disinterested director to the Board and a member of the Restructuring Committee based on (i) my expertise in the distressed market and professional experience with companies contemplating or undergoing significant restructuring transactions, both in and out of court, and (ii) the Board determining that I was independent under the Company's general director independence standards.  Further, I was retained after the transactions at issue in these chapter 11 cases, and was not involved in, or advised the Debtors on, any of these transactions.  Mr. William Transier also serves as a member of the Restructuring Committee.

8.     Since its establishment, the Restructuring Committee has met regularly with the Debtors, their advisors, and Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel"), which provided legal counsel to the Restructuring Committee, to evaluate the merits of proposed restructuring transactions, including those contemplated under the Restructuring Support Agreement, the Noteholder Plan Support Agreement, and the Plan.

### The Restructuring Committee's Investigation

9.     On May 9, 2022, the Debtors—at the direction of the Restructuring Committee— retained Quinn Emanuel as counsel to assist the Restructuring Committee in investigating the viability of any potential Claims against the Debtors' sponsor and eventual DIP lender, Brookfield Business Partners L.P. (together with its affiliates, "Brookfield").  Over the course of the following

3

months, Quinn Emanuel conducted an extensive investigation concerning historical transactions and financings involving Brookfield, largely focusing on the August 2021 exchange of Altera unsecured notes for newly issued notes with extended maturities (the "Exchange Offer"), as more fully set forth in *Debtors' Motion for Entry of an Order Authorizing and Approving the Settlement and Release of Claims and Causes of Action by and Among the Debtors and Brookfield* [Docket No. 217].  The investigation included the review of corporate formation and governance documents, corporate structure charts, documents related to Altera's liability management efforts, and internal correspondence, including thousands of documents produced by both Altera and Brookfield.  The investigation also included interviews of multiple members of the Debtors' management and Board (including Brookfield members of the Board), as well as multiple interviews of the Debtors' investment banker Evercore Group L.L.C.  Throughout the course of the investigation, Quinn Emanuel provided updates on the investigation to Mr. Transier and me.

        10.    The Restructuring Committee ultimately determined that the Debtors did not have any valuable Claims or Causes of Action against Brookfield.  In the course of negotiating potential debtor-in-possession financing with Brookfield, Brookfield made clear that a necessary term of any potential debtor-in-possession financing was a release of all potential Claims and Causes of Action held by the Debtors against Brookfield, including those based on the August 2021 exchange.  Additionally, no party was willing to extend junior debtor-in-possession financing to the Debtors on any terms, let alone better terms than Brookfield.

        11.    The Restructuring Committee (including myself) concluded that the benefits to the Debtors provided by the proposed Brookfield debtor-in-possession financing outweighed the value of any theoretical Claims and Causes of Action against Brookfield that would be released as part of the proposed debtor-in-possession financing.    The Restructuring Committee therefore

4

recommended to the Board that the Debtors enter into the proposed debtor-in-possession facility with Brookfield, and the Board unanimously agreed.

12.     Despite the Restructuring Committee's conclusions concerning the value of any potential claims against Brookfield and recommendation that the Debtors enter into the Brookfield debtor-in-possession financing facility, the Restructuring Committee worked with Quinn Emanuel, the Debtors, and their advisors to facilitate a resolution of any potential claims against Brookfield that would maximize value for all of the Debtors' stakeholders.  After participating in more than a month of intensive document and deposition discovery, the Restructuring Committee participated in the multi-day mediation with the Debtors, Brookfield, the Noteholder Ad Hoc Group, the Committee, and the CoCom that ultimately resulted in the global settlement embodied in the Plan.

### Evaluation of the Plan

13.     In my role as a member of the Restructuring Committee, I have reviewed, in consultation with the other member of the Restructuring Committee, Mr. Transier, the reasonableness and appropriateness of the global settlement and the releases, exculpations, and injunction provisions in the Plan.  I believe the global settlement embodied in the Plan is the product of extensive good faith, arms-length negotiations and reflects a reasonable compromise of the various positions of the mediation parties. The settlement embodied in the Plan contemplates, among other things, the materiality of the releases, exculpations, and injunction provisions with respect to the parties' supporting of the Plan, the value of potential litigation Claims, and the expenses of litigating such Claims.  Thus, and as set forth more fully below, I believe that the Plan, including the releases, exculpations, and injunction provisions, is reasonable under the

circumstances, appropriate, and in the best interests of the Debtors, its estates, and all of the Debtors' stakeholders for reasons discussed as follows.

### A.    The Releases in the Plan Are Appropriate.

14.    Article VIII.C of the Plan sets forth the Debtor releases (the "Debtor Release"). Through the Debtor Release, the Debtors release, among others, the Consenting Stakeholders, the Consenting Noteholders, the CoCom and each member thereof, the Committee and each member thereof, each Agent under a Consenting Bank Lenders Credit Agreement, the DIP Agent, the IntermediateCo Agents/Trustees, each of the Consenting Sponsor Entities, and current and former affiliates of the foregoing and certain related parties of the foregoing; *provided*, that, as set forth in the Plan, any Entity that opts out of the releases or that objects to the releases in the Plan (and does not withdraw such objection before Confirmation) shall not be a Released Party and therefore will not receive any benefits under the Debtor Release.[3]  The Restructuring Committee reviewed the Debtor Release and concluded it is appropriate, justified, in the best interests of the Debtors and their stakeholders, and an integral part of the Plan for several reasons.

15.    *First*, key stakeholders were extensively involved in the negotiation process that led to the Restructuring Support Agreement, the Plan, and the Noteholder Support Agreement, which evidence extensive support for the Plan among the Debtors' major constituencies.  In particular, the restructuring embodied in the Plan (including the Debtor Release) was negotiated by sophisticated parties and counsel, including months of prepetition negotiations among the Debtors, Brookfield, and the various creditor constituencies that resulted in the Restructuring Support Agreement, as well as postpetition negotiations among the parties to the Restructuring

---

[3]    The foregoing description is meant as a summary of the operative Plan provisions only.  To the extent there is any conflict between the foregoing summary and the Plan, the Plan shall control.

Support Agreement, the Noteholder Ad Hoc Group and the Committee, culminating in the multi-day mediation negotiations that resulted in the Noteholder Support Agreement. **Second**, the Debtor Release is an essential *quid pro quo* for the Released Parties' contributions to and support of the Debtors' restructuring. **Third**, the Plan, including the Debtor Release contained therein, is supported by 100% of the Debtors' Bank Lenders, Brookfield (which is both the Debtors' DIP lender and their single largest prepetition creditor), and a supermajority of the Noteholder Ad Hoc Group. **Fourth**, the Restructuring Committee determined that benefits of the global settlement reflected in the Plan far outweigh the potential value of the Causes of Action that the Debtors are releasing through the Debtor Release, especially when taking into account the costs, delay, and inconveniences that would result from litigating the Causes of Action against the Released Parties.

16.      Additionally, the releases by holders of Claims and Interests included in Article VIII.D of the Plan (the "Third-Party Release") are a negotiated term of the Plan, the inclusion of which was a condition for the Released Parties' contributions to and support of the Debtors' restructuring. Moreover, I understand that the Third-Party Release is consensual. As such, I believe the Third-Party Releases should be approved.

### B.      The Exculpation and Injunction Provisions in the Plan Are Appropriate.

17.      The Restructuring Committee also reviewed the appropriateness of the Exculpation provision contained in Article VIII.E of the Plan. I believe the Exculpation provision in the Plan is an integral piece of the overall settlement embodied by the Plan. It is limited to parties that have performed valuable services in connection with the Debtors' restructuring, and is the product of good faith, arm's-length negotiations. I understand the Exculpation provision is narrowly tailored to exclude acts of actual fraud, willful misconduct, or gross negligence, and relates only to acts or omissions in connection with, or arising out, of the Debtors' restructuring. As such, I believe the

Exculpation provision is a critical component of the Plan, and along with the Debtor Release and Third-Party Release, forms an integral piece of the overall settlement embodied in the Plan.

18.     The injunction provision set forth in Article VIII.F of the Plan (the "Injunction Provision") is also a necessary part of the Plan because it enforces the discharge, release, and exculpation provisions.  Further, the Injunction Provision affords the Debtors and their stakeholders (including, among others, the Released Parties and the Exculpated Parties) a greater degree of certainty with respect to the Chapter 11 Cases and the Restructuring Transactions by requiring the Court's authorization for parties to commence or pursue Claims or Causes of Action that relate to or are reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to the Debtor Release, the Third-Party Release, or the Exculpation.  Finally, the Injunction Provision is consensual as to any party that did not specifically object to it.  As such, I believe the Injunction Provision should be approved.

19.     Based on these considerations, as a disinterested director of the Board of Altera GP and a member of the Restructuring Committee, I determined that the Plan is fair, reasonable, and in the best interests of the Debtors, their estates, and their stakeholders, and that the Debtor Release, Third-Party Release, Exculpation provision, and Injunction Provision should be approved as part of confirmation of the Plan.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: November 3, 2022

/s/ Carol Flaton
Carol Flaton
Title: Member of the Board of Directors of
Altera Infrastructure GP L.L.C.