**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ALTERA INFRASTRUCTURE L.P., *et al.*,[1] | ) | Case No. 22-90130 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' MEMORANDUM OF LAW
IN SUPPORT OF (I) FINAL APPROVAL OF THE THIRD
AMENDED DISCLOSURE STATEMENT FOR THE SECOND
AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
ALTERA INFRASTRUCTURE L.P. AND ITS DEBTOR AFFILIATES; AND
(II) CONFIRMATION OF THE THIRD AMENDED JOINT CHAPTER 11 PLAN OF
REORGANIZATION OF ALTERA INFRASTRUCTURE L.P. AND ITS DEBTOR
AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' Claims and Noticing Agent at https://cases.stretto.com/Altera.  The location of Debtor Altera Infrastructure L.P.'s principal place of business and the Debtors' service address in these chapter 11 cases is Altera House, Unit 3, Prospect Park, Prospect Road, Arnhall Business Park, Westhill, AB32 6FJ, United Kingdom.

Page

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...........................................................................................2

BACKGROUND .................................................................................................................4

I.      Results of the Solicitation and Noticing Process. ...................................................4

ARGUMENT ......................................................................................................................7

I.      The Disclosure Statement Contains "Adequate Information" as Required by
        Section 1125 of the Bankruptcy Code, and the Debtors Complied with Applicable
        Notice Requirements.............................................................................................7

        A.      The Disclosure Statement Contains Adequate Information....................7

        B.      The Debtors Complied with the Applicable Notice Requirements. ..........10

        C.      Solicitation of the Plan Complied with the Bankruptcy Code and
                Was in Good Faith. ................................................................................10

II.     The Plan Satisfies Each Requirement for Confirmation.....................................11

        A.      The Plan Complies with the Applicable Provisions of the
                Bankruptcy Code (Section 1129(a)(1))..................................................11

                1.      The Plan Satisfies the Classification Requirements of
                        Section 1122 of the Bankruptcy Code. ......................................11

                2.      The Plan Satisfies the Mandatory Plan Requirements of
                        Section 1123(a) of the Bankruptcy Code...................................14

                        a.      Designation of Classes of Claims and Equity Interests
                                (Section 1123(a)(1))..................................................15

                        b.      Specification of Unimpaired Classes (Section 1123(a)(2)). ..........15

                        c.      Treatment of Impaired Classes (Section 1123(a)(3))....................15

                        d.      Equal Treatment within Classes (Section 1123(a)(4))..................15

                        e.      Means for Implementation (Section 1123(a)(5)). .........................16

                        f.      Issuance of Non-voting Securities (Section 1123(a)(6)). ..............17

                        g.      Directors and Officers (Section 1123(a)(7)). ................................17

**Page**

3.     The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.....................................................18

4.     The Plan Complies with Section 1123(d) of the Bankruptcy Code. ........................................................................................19

B.     The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).................................................20

1.     The Debtors Complied with Section 1125 of the Bankruptcy Code. ........................................................................21

2.     The Debtors Complied with Section 1126 of the Bankruptcy Code. ........................................................................21

C.     The Plan Was Proposed in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3)). ...............................................23

D.     The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (Section 1129(a)(4)).......................24

E.     The Debtors Have Complied with the Bankruptcy Code's Governance Disclosure Requirement (Section 1129(a)(5))....................................25

F.     The Plan Does Not Require Governmental Regulatory Approval (Section 1129(a)(6)). ........................................................................26

G.     The Plan Is in the Best Interests of All the Debtors' Creditors (Section 1129(a)(7)). ........................................................................27

H.     The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code. ........................................28

I.     The Plan Provides for Payment in Full of All Allowed Priority Claims (Section 1129(a)(9)). ................................................................29

J.     At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (Section 1129(a)(10)).......................................................................31

K.     The Plan Is Feasible (Section 1129(a)(11)). .............................................31

L.     All Statutory Fees Have Been or Will Be Paid (Section 1129(a)(12)). ........................................................................33

M.     All Retiree Benefits Will Continue Post-Confirmation (Section 1129(a)(13)). ........................................................................34

N.     Sections 1129(a)(14) Through 1129(a)(16) Do Not Apply to the Plan. ........................................................................34

**Page**

O.      The Plan Satisfies the "Cram Down" Requirements of
Section 1129(b) of the Bankruptcy Code .................................................. 35

       1.      The Plan Is Fair and Equitable (Section 1129(b)(2)(B)(ii)) ....................... 36

       2.      The Plan Does Not Unfairly Discriminate with Respect to
the Impaired Classes that Have Not Voted to Accept the
Plan (Section 1129(b)(1)). ........................................................ 37

P.      The Plan Complies with the Other Provisions of Section 1129 of
the Bankruptcy Code (Sections 1129(c)–(e)). ......................................... 38

III.      The Plan's Release, Exculpation, and Injunction Provisions Are Appropriate and
Comply with the Bankruptcy Code ..................................................... 39

     A.      The Debtor Release Is Appropriate and Complies with the
Bankruptcy Code. ............................................................... 41

     B.      The Third Party Release Is Appropriate and Complies with the
Bankruptcy Code. ............................................................... 44

     C.      The Exculpation Provision Is Appropriate and Complies with the
Bankruptcy Code. ............................................................... 48

     D.      The Injunction Provision Is Appropriate and Complies with the
Bankruptcy Code. ............................................................... 49

WAIVER OF BANKRUPTCY RULE 3020(E) .......................................... 50

CONCLUSION ........................................................................ 51

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Applewood Chair Co. v. Three Rivers Plan. & Dev. Dist. (In re Applewood Chair Co.)*,
   203 F.3d 914 (5th Cir. 2000) ................................................44

*B.D. Int'l Disc. Corp. v. Chase Manhattan Bank (In re B.D. Int'l Disc. Corp.)*,
   701 F.2d 1071 (2d Cir. 1983)................................................23

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
   526 U.S. 434 (1999)................................................27, 35

*Berkeley Fed. Bank & Trust v. Sea Garden Motel & Apartments (In re Sea Garden Motel & Apartments)*,
   195 B.R. 294 (D.N.J. 1996) ................................................31

*Century Glove, Inc. v. First Am. Bank of N.Y.*,
   860 F.2d 94 (3d Cir. 1988)................................................7

*DISH Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*,
   634 F.3d 79 (2d Cir. 2011)................................................36

*Floyd v. Hefner*,
   No. CIV.A. H-03-5693, 2006 WL 2844245 (S.D. Tex. Sept. 29, 2006) ................................................8

*FOM Puerto Rico, S.E. v. Dr. Barnes Eyecenter, Inc.*,
   255 Fed. App'x 909 (5th Cir. 2007) ................................................44

*Heartland Fed. Sav. & Loan Assoc. v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*,
   994 F.2d 1160 (5th Cir. 1993) ................................................12

*Hernandez v. Larry Miller Roofing, Inc.*,
   628 Fed. App'x 281 (5th Cir. 2016); ................................................44

*In re 203 N. LaSalle St. Ltd. P'ship*,
   190 B.R. 567 (Bankr. N.D. Ill. 1995), *rev'd on other grounds*, *203 N. LaSalle*,
   526 U.S. 434 (1999)................................................36

*In re Adelphia Commc'ns Corp.*,
   368 B.R. 140 (Bankr. S.D.N.Y. 2007) ................................................27

*In re Aleris Int'l, Inc.*,
   No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010) ................................................37

**Page(s)**

*In re Ameriforge Grp., Inc.*,
No. 17-32660 (Bankr. S.D. Tex. May 24, 2017) ..................................................45

*In re Applegate Prop., Ltd.*,
133 B.R. 827 (Bankr. W.D. Tex. 1991) ..........................................................7, 8

*In re Armstrong World Indus., Inc.*,
348 B.R. 111 (D. Del. 2006) ..........................................................................7, 37

*In re Armstrong World Indus., Inc.*,
432 F.3d 507 (3d Cir. 2005) ..............................................................................36

*In re Aztec Co.*,
107 B.R. 585 (Bankr. M.D. Tenn. 1989) ............................................................36

*In re Bigler LP*,
442 B.R. 537 (Bankr. S.D. Tex. 2010) ..............................................................41

*In re Block Shim Dev. Company-Irving*,
939 F.2d 289 (5th Cir. 1991) ............................................................................23

*In re Camp Arrowhead, Ltd.*,
451 B.R. 678 (Bankr. W.D. Tex. 2011) ............................................................50

*In re Capmark Fin. Grp. Inc.*,
No. 09-13684 (CSS), 2011 WL 6013718 (Bankr. D. Del. Oct. 5, 2011) ..............31

*In re Carlson Travel, Inc.*,
No. 21-90017 (MI) (S.D. Tex. Nov. 12, 2021) ..................................................46

*In re Century Glove*,
Nos. 90–400–SLR, 90–401–SLR, 1993 WL 239489 (D. Del. Feb. 10, 1993) ..........23, 27

*In re Chapel Gate Apartments, Ltd.*,
64 B.R. 569 (Bankr. N.D. Tex. 1986) ................................................................24

*In re Energy & Exploration Partners, Inc.*,
No. 15 44931 (Bankr. N.D. Tex. April 21, 2016) ................................................45

*In re Flintkote Co.*,
486 B.R. 99 (Bankr. D. Del. 2012) ....................................................................31

*In re Freymiller Trucking, Inc.*,
190 B.R. 913 (Bankr. W.D. Okla. 1996) ............................................................37

*In re Gen. Homes Corp.*,
134 B.R. 853 (Bankr. S.D. Tex. 1991) ..........................................................41, 42

**Page(s)**

*In re Heritage Org., L.L.C.,*
  375 B.R. 230 (Bankr. N.D. Tex. 2007) .......................................................................... 12, 41

*In re Hornbeck Offshore Servs., Inc.,*
  No. 20-32679 (Bankr. S.D. Tex. June 19, 2020) ................................................................. 45

*In re Idearc Inc.,*
  423 B.R. 138 (Bankr. N.D. Tex. 2009) ................................................................................. 37

*In re J.D. Mfg., Inc.,*
  No. 07-36751, 2008 WL 4533690 (Bankr. S.D. Tex. Oct. 2, 2008) ........................................ 7

*In re Johns-Manville Corp.,*
  68 B.R. 618 (Bankr. S.D.N.Y. 1986) .................................................................................... 37

*In re Katerra, Inc.,*
  No. 21-31861 (DRJ) (S.D. Tex. Oct. 21, 2021) .................................................................... 46

*In re Lakeside Glob. II, Ltd.,*
  116 B.R. 499 (Bankr. S.D. Tex. 1989) ............................................................................... 7, 31

*In re Landing Assocs.,*
  157 B.R. 791 (Bankr. W.D. Tex. 1993) ................................................................................. 25

*In re Lapworth,*
  No. 97-34529 (DWS), 1998 WL 767456 (Bankr. E.D. Pa. Nov. 2, 1998) ............................. 20

*In re Lason, Inc.,*
  300 B.R. 227 (Bankr. D. Del. 2003) ...................................................................................... 27

*In re Lernout & Hauspie Speech Prods., N.V.,*
  301 B.R. 651 (Bankr. D. Del. 2003) ...................................................................................... 37

*In re Lone Star Utils., LLC,*
  No. 13-34302-SGJ-11, 2014 WL 4629129 (Bankr. N.D. Tex. Sept. 15, 2014) ....................... 7

*In re M & S Assocs. Ltd.,*
  138 B.R. 845 (Bankr. W.D. Tex. 1992) ................................................................................. 32

*In re Metrocraft Publ'g Servs., Inc.,*
  39 B.R. 567 (Bankr. N.D. Ga. 1984) ...................................................................................... 9

*In re Mirant Corp.,*
  348 B.R. 725 (Bankr. N.D. Tex. 2006) .............................................................................. 41, 42

*In re Neff,*
  60 B.R. 448 (Bankr. N.D. Tex. 1985), *aff'd,* 785 F.2d 1033 (5th Cir. 1986) ......................... 27

**Page(s)**

*In re Neiman Marcus Grp. LTD LLC*,
No. 20-32519 (DRJ) (S.D. Tex. Sept. 04, 2020) ..................................................46

*In re Nutritional Sourcing Corp.*,
398 B.R. 816 (Bankr. D. Del. 2008) ...................................................................11

*In re Phx. Petroleum*,
278 B.R. 385 (Bankr. E.D. Pa. 2001) ...................................................................9

*In re Pisces Energy, LLC*,
No. 09-36591-H5-11, 2009 WL 7227880 (Bankr. S.D. Tex. Dec. 21, 2009) .........12

*In re Prussia Assocs.*,
322 B.R. 572 (Bankr. E.D. Pa. 2005) ..................................................................31

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000)...............................................................................48

*In re S & W Enter.*,
37 B.R. 153 (Bankr. N.D. Ill. 1984) ...................................................................11

*In re Scioto Valley Mortg. Co.*,
88 B.R. 168 (Bankr. S.D. Ohio 1988)....................................................................9

*In re Sentry Operating Co. of Tex., Inc.*,
264 B.R. 850 (Bankr. S.D. Tex. 2001) ................................................................12

*In re Southcross Holdings, LP*,
No. 16-20111 (Bankr. S.D. Tex. April 11, 2016) ................................................45

*In re Sun Country Dev., Inc.*,
764 F.2d 406 (5th Cir. 1985) .......................................................................22, 23

*In re T-H New Orleans Ltd. P'ships*,
116 F.3d 790 (5th Cir. 1997) .......................................................................23, 31

*In re Tribune Co.*,
464 B.R. 126 (Bankr. D. Del. 2011) ...................................................................31

*In re U.S. Brass Corp.*,
194 B.R. 420 (Bankr. E.D. Tex. 1996) ..............................................................7, 9

*In re Ultra Petroleum Corp.*,
No. 16-32202 (MI) (S.D. Tex. Mar. 14, 2017) ....................................................46

*In re Vitro Asset Corp.*,
No. 11-32600-HDH, 2013 WL 6044453 (Bankr. N.D. Tex. Nov. 14, 2013)..........12

**Page(s)**

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012) ................................................................................23, 31

*In re Wool Growers*,
    371 B.R. 768 (N.D. Tex. 2007) ..................................................................................44

*In re WorldCom, Inc.*,
    No. 02-13533 (AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) .......................20

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
    987 F.2d 154 (3d Cir. 1993) ................................................................................12, 35

*Kane v. Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988) .......................................................................................31

*Kirk v. Texaco, Inc.*,
    82 B.R. 678 (S.D.N.Y. 1988) .......................................................................................8

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
    337 F.3d 314 (3d Cir. 2003) .........................................................................................7

*Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'Ship (In re Ambanc La Mesa Ltd. P'ship)*,
    115 F.3d 650 (9th Cir. 1997) ......................................................................................35

*Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*,
    150 F.3d 503 (5th Cir. 1998) .........................................................................................7

*NLRB v. Bildisco & Bildisco*,
    465 U.S. 513 (1984) ...................................................................................................23

*Off. Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc.*
    *(In re Cajun Elec. Power Coop., Inc.)*,
    119 F.3d 349 (5th Cir. 1997) ......................................................................................42

*Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*,
    761 F.2d 1374 (9th Cir. 1985) ....................................................................................31

*Republic Supply Co. v. Shoaf*,
    815 F.2d 1046 (5th Cir. 1987) ................................................................................44, 45

*Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*,
    844 F.2d 1142 (5th Cir. 1988) .......................................................................................8

*Westland Oil Dev. Corp. v. MCorp Mgmt. Sols., Inc.*,
    157 B.R. 100 (S.D. Tex. 1993) .....................................................................................9

**Page(s)**

**Statutes**

11 U.S.C. § 101(51D)(B) ........................................................................38

11 U.S.C. § 328(a) ................................................................................25

11 U.S.C. § 330(a)(1)(A) ......................................................................25

11 U.S.C. § 365 ....................................................................................19

11 U.S.C. § 503(b) ...............................................................................29

11 U.S.C. § 507(a) ....................................................................14, 29, 33

11 U.S.C. § 1114 ..................................................................................33

11 U.S.C. § 1122(a) ...............................................................11, 12, 14

11 U.S.C. § 1123 ............................................................................11, 19

11 U.S.C. § 1123(a) ................................................14, 15, 17, 26

11 U.S.C. § 1123(b) ...............................................18, 19, 38, 41

11 U.S.C. § 1123(d) .............................................................................19

11 U.S.C. § 1125 ..........................................................................*passim*

11 U.S.C. § 1125(a) ..........................................................7, 8, 9, 16

11 U.S.C. § 1125(b) ...............................................................................7

11 U.S.C. § 1125(e) .............................................................................10

11 U.S.C. § 1126 ........................................................................5, 20, 21

11 U.S.C. § 1126(a) .............................................................................21

11 U.S.C. § 1126(c) .............................................................................22

11 U.S.C. § 1126(d) .............................................................................22

11 U.S.C. § 1126(f) .......................................................................5, 21

11 U.S.C. § 1126(g) ......................................................................5, 21

11 U.S.C. § 1129(a) ......................................................................*passim*

11 U.S.C. § 1129(b) ......................................................................*passim*

<u>Page(s)</u>

11 U.S.C. § 1129(c) ...................................................................................................38

11 U.S.C. § 1129(d) ..................................................................................................38

11 U.S.C. § 1129(e) ..................................................................................................38

15 U.S.C § 77a ..........................................................................................................38

**Rules**

Fed. R. Bankr. P. 3020(e) .........................................................................................50

**Other Authorities**

H.R. Rep. No. 95-595, *reprinted in* 1978 U.S.C. C.A.N. 5963 (1977) ...................11, 20

S. Rep. No. 95-989, *reprinted in* 1978 U.S.C. C.A.N. 5787 (1978).......................11, 20

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this memorandum of law (this "Memorandum") in support of (a) final approval of the *Third Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Altera Infrastructure L.P. and Its Debtor Affiliates* [Docket No. 441] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") and (b) Confirmation of the *Third Amended Joint Chapter 11 Plan of Reorganization of Altera Infrastructure L.P. and Its Debtors Affiliates* [Docket No. 516] (as modified, amended, or supplemented from time to time, the "Plan").[2]  In further support of Confirmation of the Plan, contemporaneously herewith, the Debtors have filed:   (i) the *Declaration of David Rush, Senior Managing Director of FTI Consulting, Inc., in Support of Confirmation of the Third Amended Joint Chapter 11 Plan of Reorganization of Altera Infrastructure L.P. and Its Debtor Affiliates* (the "Rush Declaration"); (ii) the *Declaration of Jan Rune Steinsland, Chief Financial Officer of Altera Infrastructure Group Ltd., in Support of Confirmation of the Third Amended Joint Chapter 11 Plan of Reorganization of Altera Infrastructure L.P. and Its Debtor Affiliates* (the "Steinsland Declaration"); (iii) the *Declaration of Mark Whatley, Senior Managing Director at Evercore Group LLC, in Support of Confirmation of the Third Amended Joint Chapter 11 Plan of Reorganization of Altera Infrastructure L.P. and Its Debtor Affiliates* (the "Whatley Declaration"); (iv) the *Declaration of Carol Flaton, in Support of Confirmation of the Third Amended Joint Chapter 11 Plan of Reorganization of Altera Infrastructure L.P. and Its Debtor Affiliates* (the "Flaton Declaration"); and (v) the *Declaration of James Sean McGuire in Support of Confirmation of the Debtors' Third*

---

[2]   Capitalized terms used but not defined in this Memorandum shall have the meanings ascribed to such terms in the Plan or the Disclosure Statement, as applicable.

*Amended Joint Chapter 11 Plan of Reorganization of Altera Infrastructure L.P. and Its Debtor Affiliates* (the "Voting Report").

## PRELIMINARY STATEMENT

1.        The Plan is a remarkable achievement and should be confirmed.   The Plan represents extraordinary consensus between the Debtors and the constituents of the Debtors' prepetition capital structure and has been overwhelmingly accepted by each Voting Class.   Indeed, Classes 3, 4, 5(a)–(g), 6(a)–(g), and 7 have ***unanimously*** voted to accept accepted the Plan. Importantly, no stakeholder has objected to confirmation of the Plan.   As a consequence of the tireless efforts of the Debtors and their stakeholders, as well as assistance and guidance from the Court, the Debtors are now positioned to move forward with confirmation of the Plan ***on a fully consensual basis***.

2.        The Debtors filed these chapter 11 cases with the support of, and consensus from, the Consenting Bank Lenders and Brookfield on a path forward that would substantially de-lever the business and leave unsecured claims at the subsidiary Debtors Unimpaired.   Since the Petition Date, the Debtors engaged extensively with their remaining stakeholders in the Noteholder Ad Hoc Group and the Committee, as well as with Brookfield and the Consenting Bank Lenders, to negotiate a comprehensive path forward to maximize the value of their Estates, enable a comprehensive balance-sheet restructuring, and provide meaningful recoveries to stakeholders. To facilitate those efforts, the Debtors brought the key constituencies to the negotiating table to achieve consensus—including three days of near-around-the-clock mediation with the Noteholder Ad Hoc Group and the Committee before the Honorable Chief Judge David R. Jones.

3.        The efforts proved fruitful, resulting in the execution of the Noteholder Plan Support Agreement between the Debtors, Brookfield, the Noteholder Ad Hoc Group, and the Committee.   Following mediation, and with the Noteholder Plan Support Agreement in hand, the

Debtors secured approval of the Disclosure Statement on a conditional basis and commenced solicitation of a Plan supported by over 90% of the Debtors' funded debt obligations, including Brookfield (the Debtors' DIP lender, largest pre-petition creditor, and equity sponsor), approximately 91% of the debt held by the Bank Lenders, and approximately 65.7% of the debt held by the Noteholders.

4.      Today, just twelve weeks after the Petition Date, the Debtors stand ready to confirm a Plan that will deleverage the Debtors' balance sheet by equitizing approximately $1 billion in junior debt obligations, paying administrative and priority claims in full, and rendering general unsecured claims at subsidiary Debtors Unimpaired.  Further, the Plan transactions will include an equity rights offering that will repay the $70 million DIP Facility and the remaining IntermediateCo RCF upon emergence and raise up to an additional $12.55 million in cash, maximizing liquidity to position the Debtors for future success.  The Plan enables the Debtors to emerge from chapter 11 as a stronger, better-capitalized enterprise.

5.      Importantly, the Debtors have ensured that all stakeholders received the due process and transparency critical to the chapter 11 process.  The Debtors' robust noticing program provided every known stakeholder—including parties not entitled to vote on the Plan—with notice of (a) the commencement of these chapter 11 cases and (b) the Debtors' request for a hearing to consider the approval of the Disclosure Statement and confirmation of the Plan on November 4, 2022 (the "Combined Hearing").  The notices also included information on other key dates, methods by which parties could request copies of the Plan and Disclosure Statement, and key terms of the Plan, including the full text of the release, exculpation, and injunction provisions set forth in the Plan, and the manner in which parties could elect to opt out of the Third Party Release included in the Plan.

6.      The Plan enjoys the support of every Voting Class—a testament to the confidence that the Debtors' stakeholders have not only in the Debtors' Plan but in the Debtors' go-forward operations outside of chapter 11.   As of the date hereof, all voting creditors in the Debtors' 17 Voting Classes of secured Claims voted to accept the Plan, while 96.0% of the unsecured noteholders holding 99.9% of the Claims in Class 8 voted to accept, as set forth below.[3]

7.      The Plan satisfies the applicable requirements of the Bankruptcy Code, achieves an extraordinary result that is in the best interests of the Debtors and all of their stakeholders, and should be confirmed.   Accordingly, the Debtors request that the Bankruptcy Court enter the Confirmation Order.

## **BACKGROUND**

### I.      **Results of the Solicitation and Noticing Process.**

8.      On October 7, 2022, the Court entered the order conditionally approving the Disclosure Statement [Docket No. 417] (the "Disclosure Statement Order").   The Disclosure Statement Order approved, among other things, the proposed procedures for solicitation of the Plan and related notices, forms, and ballots (collectively, the "Solicitation Packages").

9.      Pursuant to the Disclosure Statement Order, the Debtors caused Stretto to distribute the Solicitation Packages to all Holders of Claims entitled to vote on the Plan as of September 30 2022—*i.e.*, Holders of IntermediateCo Notes Claims, IntermediateCo RCF Claims, Credit Agreement Claims Against Subsidiary Debtors, Credit Agreement Claims Against Altera Parent, IntermediateCo Guarantee Claims, and Altera Unsecured Notes Claims and other General Unsecured Claims at Altera Parent and Altera Finance Corp.—by October 12, 2022, the

---

[3]     *See* Voting Report.

solicitation deadline.[4]   The Debtors also caused the Publication Notice (as defined in the Disclosure Statement Order) to be published in the *New York Times* (national edition) and the *Financial Times* (global edition) on October 14, 2022 and October 17, 2022, respectively, in accordance with the Disclosure Statement Order.[5]

10.     In compliance with the Bankruptcy Code and the Disclosure Statement Order, only Holders of Claims in Impaired Classes entitled to receive or retain property on account of such Claims were permitted to vote to accept or reject the Plan.[6]   Holders of Claims and Interests were not entitled to vote if their rights are (a) Unimpaired under the Plan (in which case such Holders were conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code) or (b) Impaired and such Holders are not entitled to receive any distribution under the Plan (in which case such Holders were conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code).

11.     The deadline for all holders of Claims entitled to vote on the Plan to cast their ballots and the deadline to file objections to confirmation to the Plan was November 1, 2022 at 4:00 p.m. (prevailing Central Time) (the "Voting Deadline").   On November 3, 2022, the Debtors filed the Voting Report, which is summarized below in detail.  The Combined Hearing is scheduled for November 4, 2022 at 10:00 a.m., prevailing Central Time.  The Debtors filed contemporaneously herewith a proposed order confirming the Plan (the "Confirmation Order").

12.     As set forth above and in the Voting Report, Holders of Claims in Classes 3, 4, 5(a)–(g), 6(a)–(g), 7, and 8 were entitled to vote to accept or reject the Plan (each, a "Voting Class"

---

[4]   *See Certificates of Service of Solicitation Materials* [Docket Nos. 455, 504, 505].

[5]   *See Affidavits of Publication* [Docket Nos. 461 and 462].

[6]   *See* 11 U.S.C. § 1126.

and collectively, the "Voting Classes").  The voting results, as reflected in the Voting Report, are summarized as follows:[7]

| CLASSES | TOTAL BALLOTS RECEIVED | | | |
| --- | --- | --- | --- | --- |
| | Accept | | Reject | |
| | AMOUNT (% of Amount/ Shares Voting) | NUMBER (% of Number Voting) | AMOUNT (% of Amount/ Shares Voting) | NUMBER (% of Number Voting) |
| Class 3 – IntermediateCo Notes Claims | $957,117,028 (100%) | 5 (100%) | $0 (0%) | 0 (0%) |
| Class 4 – IntermediateCo RCF Claims | $12,151,028 (100%) | 1 (100%) | $0 (0%) | 0 (0%) |
| Class 5(a)–(g) – Credit Agreement Claims against Subsidiary Debtors | $551,651,278 (100%) | 45 (100%) | $0 (0%) | 0 (0%) |
| Class 6(a)–(g) – Credit Agreement Claims against Altera Parent | $551,651,278 (100%) | 30 (100%) | $0 (0%) | 0 (0%) |
| Class 7 – IntermediateCo Guarantee Claims | $957,117,028 (100%) | 5 (100%) | $0 (0%) | 0 (0%) |
| Class 8 – Altera Unsecured Notes Claims and other General Unsecured Claims at Altera Parent and Altera Finance Corp. | $220,702,066 (99.9%) | 95 (96.0%) | $174,000 (0.1%) | 4 (4.0%) |

---

[7]   *See* Voting Report.

## ARGUMENT

13.     This memorandum is divided into three parts.  ***First***, the Debtors request approval of the Disclosure Statement on a final basis and a finding that the Debtors have satisfied all notice requirements approved in the Disclosure Statement Order.  ***Second***, the Debtors present their "case in chief" that the Plan satisfies section 1129 of the Bankruptcy Code and, accordingly, request that the Court confirm the Plan.[8]  ***Third***, as part of the Debtors' "case in chief," the Debtors set forth how the release, exculpation, and injunction provisions comply with the Bankruptcy Code, prevailing law, and are in the best interests of the Debtors' Estates.

## I.     The Disclosure Statement Contains "Adequate Information" as Required by Section 1125 of the Bankruptcy Code, and the Debtors Complied with Applicable Notice Requirements.

### A.     The Disclosure Statement Contains Adequate Information.

14.     The primary purpose of a disclosure statement is to provide "adequate information" that allows parties entitled to vote on a proposed plan to make an informed decision about whether to vote to accept or reject the plan.[9]  "Adequate information" is a flexible standard, based on the

---

[8]     *See In re Lakeside Glob. II, Ltd.*, 116 B.R. 499, 505 (Bankr. S.D. Tex. 1989) ("In order to confirm a reorganization plan, the bankruptcy court must be satisfied that the plan complies with all of the requirements of § 1129(a) of the Bankruptcy Code."); *In re Lone Star Utils., LLC*, No. 13-34302-SGJ-11, 2014 WL 4629129, at *2 (Bankr. N.D. Tex. Sept. 15, 2014) ("The Debtor has the burden of proving the elements of Bankruptcy Code section 1129(a) by a preponderance of the evidence."); *see also In re Armstrong World Indus., Inc.*, 348 B.R. 111, 119–20 (D. Del. 2006) ("To confirm the Plan, the Court must determine whether it meets the specific requirements of Section 1129.").

[9]     *See, e.g., In re J.D. Mfg., Inc.*, No. 07-36751, 2008 WL 4533690, at *2 (Bankr. S.D. Tex. Oct. 2, 2008) ("'Adequacy' of information is a determination that is relative both to the entity (e.g. assets/business being reorganized or liquidated) and to the sophistication of the creditors to whom the disclosure statement is addressed."); *In re U.S. Brass Corp.*, 194 B.R. 420, 423 (Bankr. E.D. Tex. 1996) ("The purpose of the disclosure statement is . . . to provide enough information to interested persons so they may make an informed choice . . . ."); *In re Applegate Prop., Ltd.*, 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991) ("A court's legitimate concern under Section 1125 is assuring that hypothetical reasonable investors receive such information as will enable them to evaluate for *themselves* what may impact the information might have on their claims and on the outcome of the case . . . ."); *see also Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321–22 (3d Cir. 2003) ("Under 11 U.S.C. § 1125(b), a party seeking chapter 11 bankruptcy protection has an affirmative duty to provide creditors with a disclosure statement containing adequate information to enable a creditor to make an informed judgment about the Plan.") (internal quotation marks omitted); *Century Glove, Inc. v. First Am. Bank*

facts and circumstances of each case.[10]  Courts within the Fifth Circuit and elsewhere acknowledge that determining what constitutes "adequate information" for the purpose of satisfying section 1125 of the Bankruptcy Code resides within the broad discretion of the court.[11]

15.     Courts look for certain information when evaluating the adequacy of the disclosures in a proposed disclosure statement, including:

i.      the events which led to the filing of a bankruptcy petition;

ii.     the relationship of a debtor with the affiliates;

iii.    a description of the available assets and their value;

iv.     the anticipated future of the company;

v.      the source of information stated in the disclosure statement;

vi.     the present condition of a debtor while in chapter 11;

vii.    the claims asserted against a debtor;

viii.   the estimated return to creditors under a chapter 7 liquidation;

ix.     the future management of a debtor;

---

*of N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988) ("§ 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote.").

[10]   11 U.S.C. § 1125(a)(1) ("'[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records."); *Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 518 (5th Cir. 1998) (citations omitted) ("The legislative history of § 1125 indicates that, in determining what constitutes 'adequate information' with respect to a particular disclosure statement, both the kind and form of information are left essentially to the judicial discretion of the court and that the information required will necessarily be governed by the circumstances of the case."); *Floyd v. Hefner*, No. CIV.A. H-03-5693, 2006 WL 2844245, at *30 (S.D. Tex. Sept. 29, 2006) (noting that what constitutes "adequate information" is a flexible standard); *In re Applegate Prop., Ltd.*, 133 B.R. at 829 ("The issue of adequate information is usually decided on a case by case basis and is left largely to the discretion of the bankruptcy court.").

[11]   *See, e.g.*, *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1157 (5th Cir. 1988) ("The determination of what is adequate information is subjective and made on a case by case basis.  This determination is largely within the discretion of the bankruptcy court."); *Kirk v. Texaco, Inc.*, 82 B.R. 678, 682 (S.D.N.Y. 1988) ("The legislative history could hardly be more clear in granting broad discretion to bankruptcy judges under § 1125(a).").

x. the chapter 11 plan or a summary thereof;

xi. the financial information, valuations, and projections relevant to the claimants' decision to accept or reject the chapter 11 claim;

xii. the information relevant to the risks posed to claimants under the plan;

xiii. the actual or projected realizable value from recovery of preferential or otherwise voidable transfers;

xiv. the litigation likely to arise in a nonbankruptcy context; and

xv. the tax attributes of a debtor.[12]

16.     The Disclosure Statement contains adequate information and was previously approved on a conditional basis on October 7, 2022.[13]   The Disclosure Statement contains descriptions and summaries of, among other things:  (a) both the Plan and the Debtors' related reorganization efforts; (b) certain events and relevant negotiations preceding the commencement of these chapter 11 cases; (c) the key terms of the restructuring; (d) risk factors affecting the Plan, including risks related to the Restructuring Transactions, risks related to the Debtors' businesses, and risks related to recoveries under the Plan; (e) a liquidation analysis setting forth the estimated return that holders of Claims and Interests would receive in a hypothetical chapter 7 case; (f) financial information and valuations that would be relevant to a creditor's determinations of whether to accept or reject the Plan; and (g) federal tax law consequences of the Plan.

---

[12]   *In re U.S. Brass Corp.*, 194 B.R. at 424–25 (listing factors courts have considered in determining the adequacy of information provided in a disclosure statement); *Westland Oil Dev. Corp. v. MCorp Mgmt. Sols., Inc.*, 157 B.R. 100, 102 (S.D. Tex. 1993) (same); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170–71 (Bankr. S.D. Ohio 1988) (same); *In re Metrocraft Publ'g Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984) (same).   Disclosure regarding all topics "is not necessary in every case." *In re U.S. Brass Corp.*, 194 B.R. at 425; *see also In re Phx. Petroleum*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) ("[C]ertain categories of information which may be necessary in one case may be omitted in another . . . .").

[13]   *See* Disclosure Statement Order [Docket No. 417].

17.     As discussed above, section 1125(a) requires only "adequate information" sufficient for parties entitled to vote on a proposed plan to make an informed decision about whether to vote to accept or reject the plan.  Accordingly, the Disclosure Statement contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code and should be approved.

**B.      The Debtors Complied with the Applicable Notice Requirements.**

18.     In addition to conditionally approving the adequacy of the Disclosure Statement, the Disclosure Statement Order granted final relief regarding solicitation and noticing procedures and materials including, among other things:  (a) approving the Solicitation and Voting Procedures;  (b) approving the form and manner of the Combined Hearing Notice and the Publication Notice; and (c) approving certain dates and deadlines with respect to the Plan and Disclosure Statement.  The Debtors complied with the procedures and timeline approved by the Disclosure Statement Order.

**C.      Solicitation of the Plan Complied with the Bankruptcy Code and Was in Good Faith.**

19.     Section 1125(e) of the Bankruptcy Code provides that "a person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title . . . is not liable" on account of such solicitation for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan.[14]

20.     As set forth in the Disclosure Statement and Disclosure Statement Motion, and as demonstrated by the Debtors' compliance with the Disclosure Statement Order,[15] the Debtors at

---

[14]   11 U.S.C. § 1125(e).

[15]   *See* Voting Report.

all times engaged in arm's-length, good faith negotiations and took appropriate actions in connection with the solicitation of the Plan in compliance with section 1125 of the Bankruptcy Code. Therefore, the Debtors request that the Bankruptcy Court grant the parties the protections provided under section 1125(e) of the Bankruptcy Code.

## II.    The Plan Satisfies Each Requirement for Confirmation.

### A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).

21.    Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."[16]  The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of a plan of reorganization, respectively.[17]  As explained below, the Plan complies with the requirements of sections 1122 and 1123 of the Bankruptcy Code, as well as other applicable provisions.

### 1.    The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.

22.    The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part, as follows:

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or

---

[16]    11 U.S.C. § 1129(a)(1).

[17]    S. Rep. No. 95-989, at 126, *reprinted in* 1978 U.S.C. C.A.N. 5787, 5912 (1978); H.R. Rep. No. 95-595, at 412, *reprinted in* 1978 U.S.C. C.A.N. 5963, 6368 (1977); *In re S & W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were Sections 1122 and 1123."); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008) (noting that a plan must comply with Sections 1122 and 1123).

interest is substantially similar to the other claims or interests of
such class.[18]

23.     For a classification structure to satisfy section 1122 of the Bankruptcy Code, not all
substantially similar claims or interests need to be grouped in the same class.[19]  Instead, claims or
interests designated to a particular class must be substantially similar to each other.[20]  Courts in
this jurisdiction and others have recognized that plan proponents have significant flexibility in
placing similar claims into different classes, provided there is a rational basis to do so.[21]

24.     The Plan's classification of Claims and Interests satisfies the requirements of
section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into 26 separate
Classes, with each Class differing from the Claims and Interests in each other Class in a legal or

---

[18]   11 U.S.C. § 1122(a).

[19]   *See In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 860 (Bankr. S.D. Tex. 2001) (recognizing that section 1122 is broadly "permissive of any classification scheme that is not specifically proscribed, and that substantially similar claims may be separately classified").

[20]   *In re Vitro Asset Corp.*, No. 11-32600-HDH, 2013 WL 6044453, at *5 (Bankr. N.D. Tex. Nov. 14, 2013) ("[A] plan may provide for multiple classes of claims or interests so long as each claim or interest within a class is substantially similar to other claims or interests in that class.").

[21]   Courts have identified grounds justifying separate classification, including:  (a) where there are good business reasons for separate classification, and (b) where members of a class possess different legal rights.  *Heartland Fed. Sav. & Loan Assoc. v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1167 (5th Cir. 1993) (recognizing that "there may be good business reasons to support separate classification"); *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993) (holding that a classification scheme is proper as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed"); *see also In re Pisces Energy, LLC*, No. 09-36591-H5-11, 2009 WL 7227880, at *8 (Bankr. S.D. Tex. Dec. 21, 2009) ("[A] plan proponent is afforded significant flexibility in classifying claims under section 1122(a) of the Bankruptcy Code provided there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar."); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007) ("[T]he only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan.").

factual nature or based on other relevant criteria.[22]  Specifically, the Plan provides for the separate

classification of Claims and Interests into the following Classes:

a.    <u>Class 1</u>:  Other Secured Claims;

b.    <u>Class 2</u>:  Other Priority Claims;

c.    <u>Class 3</u>:  IntermediateCo Notes Claims;

d.    <u>Class 4</u>:  IntermediateCo RCF Claims;

e.    <u>Classes 5(a)–(g)</u>:  Credit Agreement Claims against Subsidiary Debtors;[23]

f.    <u>Classes 6(a)–(g)</u>:  Credit Agreement Claims against Altera Parent;[24]

g.    <u>Class 7</u>:  IntermediateCo Guarantee Claims;

h.    <u>Class 8</u>:   Altera Unsecured Notes Claims and other General Unsecured Claims at Altera Parent and Altera Finance Corp.;

i.    <u>Class 9</u>:  General Unsecured Claims at Debtors other than Altera Parent and Altera Finance Corp.;

j.    <u>Class 10</u>:  Intercompany Claims;

k.    <u>Class 11</u>:  Intercompany Interests;

l.    <u>Class 12</u>:  Existing Preferred Interests in Altera;

---

[22]  Plan, Art. III.

[23]  Classes 5(a)–5(g) include: Class 5(a), which consists of Credit Agreement Claims arising under or in connection with the Knarr Facility; Class 5(b), which consists of Credit Agreement Claims arising under or in connection with the Petrojarl I Facility; Class 5(c), which consists of Credit Agreement Claims arising under or in connection with the Gina Krog Facility; Class 5(d), which consists of Credit Agreement Claims arising under or in connection with the Suksan Salamander Facility; Class 5(e), which consists of Credit Agreement Claims arising under or in connection with the Arendal Facility; Class 5(f), which consists of Credit Agreement Claims arising under or in connection with the 6x ALP Facility; and Class 5(g), which consists of Credit Agreement Claims arising under or in connection with the 4x ALP Facilities.

[24]  Classes 6(a)–6(g) include: Class 6(a), which consists of Credit Agreement Claims arising under or in connection with the Knarr Facility; Class 6(b), which consists of Credit Agreement Claims arising under or in connection with the Petrojarl I Facility; Class 6(c), which consists of Credit Agreement Claims arising under or in connection with the Gina Krog Facility; Class 6(d), which consists of Credit Agreement Claims arising under or in connection with the Suksan Salamander Facility; Class 6(e), which consists of Credit Agreement Claims arising under or in connection with the Arendal Facility; Class 6(f), which consists of Credit Agreement Claims arising under or in connection with the 6x ALP Facility; and Class 6(g), which consists of Credit Agreement Claims arising under or in connection with the 4x ALP Facilities.

m.     Class 13:  Existing Common Equity Interests in Altera Parent; and

n.     Class 14:  Section 510(b) Claims.

25.     Claims and Interests assigned to each particular Class described above are substantially similar to the other Claims and Interests in such Class.  In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among holders of Claims and Interests.[25]  Namely, the Plan separately classifies the Claims because each holder of such Claims or Interests may hold (or may have held) rights in the Estates legally dissimilar to the Claims or Interests in other Classes or because substantial administrative convenience resulted from such classification.[26]  For example, Claims (rights to payment) are classified separately from Interests (representing ownership in the business).  Secured Claims are classified separately from unsecured Claims because the Debtors' obligations with respect to the former are secured by collateral.  Accordingly, the Plan satisfies section 1122(a) of the Bankruptcy Code.

## 2.     The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.

26.     Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every chapter 11 plan must satisfy.[27]  The Plan satisfies each of these requirements.

---

[25]   Rush Decl. ¶ 22.

[26]   *See id.*

[27]   *See* 11 U.S.C. § 1123(a).

### a. Designation of Classes of Claims and Equity Interests (Section 1123(a)(1)).

27.     Section 1123(a)(1) of the Bankruptcy Code requires that the Plan designate "classes of claims, other than claims of a kind specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of this title, and classes of interests."[28]   For the reasons set forth above, Article III of the Plan properly designates Classes of Claims and Interests and thus satisfies this requirement of the Bankruptcy Code.

### b. Specification of Unimpaired Classes (Section 1123(a)(2)).

28.     Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan."[29]   The Plan meets this requirement by identifying each Class in Article III that is Unimpaired.

### c. Treatment of Impaired Classes (Section 1123(a)(3)).

29.     Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan."[30]   The Plan meets this requirement by setting forth the treatment of each Class in Article III that is Impaired.

### d. Equal Treatment within Classes (Section 1123(a)(4)).

30.     Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[31]   The Plan meets this requirement because holders of Allowed Claims or Interests will receive the same rights and

---

[28]   *Id.* § 1123(a)(1).

[29]   *Id.* § 1123(a)(2).

[30]   *Id.* § 1123(a)(3).

[31]   *Id.* § 1123(a)(4).

treatment as other holders of Allowed Claims or Interests within such holders' respective Class.[32] Thus, the Plan satisfies section 1123(a)(4) of the Bankruptcy Code.

### e. *Means for Implementation (Section 1123(a)(5)).*

31.     Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation.[33]  The Plan, together with the documents and forms of agreement included in the Plan Supplement,[34] provides a detailed blueprint for the transactions that underlie the Plan.

32.     Article IV of the Plan, in particular, sets forth the means for implementation of the Plan and the transactions underlying the Plan, including:  (a) effectuation of the Restructuring Transactions, including the execution and delivery of any appropriate agreements or documents pursuant to the Plan, and rejection, assumption, or assumption and assignment of Executory Contracts and Unexpired Leases; (b) entry into the Amended and Restated Bank Facilities; (c) effectuation of the Rights Offering; (d) issuance of New Common Stock; (e) issuance of the New GP Common Stock; (f) the execution and delivery of the New Warrant Agreements and the issuance of the New Warrants thereunder; (g) execution and delivery of the New Organizational Documents and any other application formation documents; and (h) other actions that each applicable Entity determines to be necessary, including making filings or records that may be required by applicable Law in connection with the Plan.[35]  In addition to these core transactions,

---

[32]   Plan, Art. III.B; Rush Decl. ¶ 25.

[33]   *See* 11 U.S.C. § 1123(a)(5).

[34]   *See Notice of Filing of Plan Supplement*, *Notice of Filing of First Amended Plan Supplement*, *Notice of Filing of Second Amended Plan Supplement*, and *Notice of Filing of Third Amended Plan Supplement* (together, and as modified, amended, or supplemented from time to time, the "Plan Supplement") [Docket Nos. 494, 498, 510, 517].

[35]   Plan, Art. IV.

the Plan sets forth the other critical mechanics of the Debtors' emergence, like the cancellation of existing securities, the establishment of certain agreements, and the settlement of Claims and Interests.[36]

33.     The precise terms governing the execution of these transactions are set forth in greater detail in the applicable definitive documents or forms of agreements included in the Plan Supplement.[37]  Thus, the Plan satisfies section 1125(a)(5) of the Bankruptcy Code.

### f.     *Issuance of Non-voting Securities (Section 1123(a)(6)).*

34.     Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of non-voting equity securities.[38]  Article IV.I of the Plan provides that the New Organizational Documents shall contain a provision prohibiting the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.[39]  In accordance with Article IV.I of the Plan, on or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Reorganized Debtors and will prohibit the issuance of non-voting equity securities. Accordingly, the Plan satisfies section 1123(a)(6) of the Bankruptcy Code.

### g.     *Directors and Officers (Section 1123(a)(7)).*

35.     Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto,

---

[36]   Rush Decl. ¶ 26; Plan, Art. IV.

[37]   *See* Plan Supplement.

[38]   *See* 11 U.S.C. § 1123(a)(6).

[39]   Plan, Art. IV.I.

be "consistent with the interests of creditors and equity security holders and with public policy."[40] The Plan satisfies this requirement by providing that, as of the Effective Date, the terms of the current members of the board of directors of Altera GP shall expire and the new directors and officers of the Reorganized Altera GP shall be appointed.[41]   Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code.

### 3.    The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.

36.    Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may:  (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts and unexpired leases; (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates; and (d) include any other appropriate provision not inconsistent with the applicable provisions of chapter 11.[42]

37.    The Plan is consistent with section 1123(b) of the Bankruptcy Code.  Specifically, under Article III of the Plan, Classes 1, 2, and 9 are Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of the holders of Claims within such Classes.[43]  On the other hand, Classes 3, 4, 5(a)–(g), 6(a)–(g), 7, 8, 12, 13, and 14 are Impaired because the Plan modifies the rights of the holders of Claims and Interests within such Classes as contemplated in

---

[40]    *See* 11 U.S.C. § 1123(a)(7).

[41]    Plan, Art. IV.K.

[42]    11 U.S.C. §§ 1123(b)(1)–(3), (6).

[43]    Plan, Art. III.

section 1123(b)(1) of the Bankruptcy Code.[44]  Classes 10 and 11 may be Impaired or Unimpaired under the Plan at the option of the Debtors.

38.     In addition and under section 1123(b)(2) of the Bankruptcy Code, Article V of the Plan provides that, on the Effective Date, except as otherwise provided in Article V.I.1 of the Plan, all Executory Contracts or Unexpired Leases that are not otherwise rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that:  (1) are identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (2) previously expired or terminated pursuant to their own terms; (3) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (4) are the subject of a motion to reject that is pending on the Effective Date; or (5) have an ordered or requested effective date of rejection that is after the Effective Date; *provided*, *however*, that the Debtors shall not reject any vessel charters related to the Amended and Restated Bank Facilities.

39.     Finally, the Plan contains release, exculpation, and injunction provisions, which for the reasons set forth below, are consistent with section 1123(b) of the Bankruptcy Code.

### 4.     The Plan Complies with Section 1123(d) of the Bankruptcy Code.

40.     Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."[45]

41.     The Plan complies with section 1123(d) of the Bankruptcy Code.  The Plan provides for the satisfaction of Cures under each Executory Contract and Unexpired Lease to be

---

[44]  *Id.*

[45]  11 U.S.C. § 1123(d).

assumed under the Plan by payment of the Cure, if any, on the Effective Date or as soon as reasonably practicable thereafter, after the dispute over the Cure is resolved, or on other terms as the parties to such Executory Contracts or Unexpired Leases may agree.[46]  In accordance with Article V of the Plan and section 365 of the Bankruptcy Code, undisputed monetary amounts required to Cure any existing defaults arising under the Executory Contract(s) and Unexpired Lease(s) to be assumed will be satisfied by the Debtors or Reorganized Debtors, as applicable.  To the extent there is a dispute related to any such Cure, the Debtors or the Reorganized Debtors, as applicable, may, with the consent of the Consenting Sponsor, reconcile and settle in the ordinary course of the Debtors' business any dispute (following a timely filed objection) regarding any Cure or any other matter pertaining to assumption without any further notice to or action, order, or approval of the Bankruptcy Court.

**B.      The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).**

42.      The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires that the proponent of a plan of reorganization comply with the applicable provisions of the Bankruptcy Code.[47]  The legislative history to section 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.[48]  As discussed below, the Debtors

---

[46]  Plan, Art. V.C.

[47]  *See* 11 U.S.C. § 1129(a)(2).

[48]  S. Rep. No. 95-989, at 126, *reprinted in* 1978 U.S.C. C.A.N. 5787, 5912 (1978); H.R. Rep. No. 95-595, at 412, *reprinted in* 1978 U.S.C. C.A.N. 5963, 6368 (1977); *In re Lapworth*, No. 97-34529 (DWS), 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *In re WorldCom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) (stating that section 1129(a)(2) requires plan proponents to comply with applicable provisions of the Bankruptcy Code, including "disclosure and solicitation requirements under sections 1125 and 1126").

have complied with sections 1125 and 1126 of the Bankruptcy Code regarding disclosure and solicitation of the Plan.

### 1. The Debtors Complied with Section 1125 of the Bankruptcy Code.

43.     As discussed above, the Debtors complied with the notice and solicitation requirements of section 1125 of the Bankruptcy Code.[49]

### 2. The Debtors Complied with Section 1126 of the Bankruptcy Code.

44.     Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a plan of reorganization.  Specifically, under section 1126 of the Bankruptcy Code, only holders of allowed claims and allowed interests in impaired classes of claims or interests that will receive or retain property under a plan on account of such claims or interests may vote to accept or reject such plan.[50]  Section 1126 of the Bankruptcy Code provides, in pertinent part, that:

> (a)     The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan.

> \*       \*       \*       \*

> (f)     Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.[51]

45.     As set forth above, in accordance with section 1125 of the Bankruptcy Code, the Debtors solicited acceptances or rejections of the Plan from the holders of Allowed Claims in Class 3, Class 4, Classes 5(a)–(g), Class 6(a)–(g), Class 7, and Class 8—the only Classes entitled

---

49   *See supra* Sections I.B–I.C.

50   *See* 11 U.S.C. § 1126.

51   *Id.* §§ 1126(a), (f).

to vote on the Plan.  The Debtors were not required to solicit votes from holders of Claims and Interests in Classes 1, 2, 9, 10, 11, 12, 13, or 14 because holders of such Claims and Interests are either Unimpaired and deemed to accept the Plan under section 1126(f) or Impaired and conclusively presumed to have rejected the Plan under section 1126(g).  Thus, pursuant to section 1126(a) of the Bankruptcy Code, only holders of Claims in Classes 3, 4, 5(a)–(g), 6(a)–(g), 7, and 8 were entitled to vote to accept or reject the Plan.

46.     Sections 1126(c) and 1126(d) of the Bankruptcy Code specify the requirements for acceptance of a plan by classes of claims and interests:

> (c)     A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

> (d)     A class of interests has accepted a plan if such plan has been accepted by holders of such interests, other than any entity designated under subsection (e) or this section, that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.[52]

47.     As described above, the Voting Parties in each Class entitled to vote on the Plan voted to accept the Plan in sufficient number and in sufficient amount to constitute an accepting Class under the Bankruptcy Code.[53]  Based upon the foregoing, the Debtors have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.

---

[52]   *Id.* §§ 1126(c), (d).

[53]   *See* Voting Report, <u>Exhibit A</u>.

C.  **The Plan Was Proposed in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3)).**

48.  Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[54]  In assessing good faith, courts in the Fifth Circuit consider whether the plan was proposed with "the legitimate and honest purpose to reorganize and has a reasonable hope of success."[55]  A plan must also achieve a result consistent with the Bankruptcy Code.[56]  The fundamental purpose of chapter 11 is to enable a distressed business to reorganize its affairs to prevent job losses and the adverse economic effects associated with disposing of assets at liquidation value.[57]  To determine whether a plan seeks relief consistent with the Bankruptcy Code, courts consider the totality of the circumstances surrounding the development of the plan.[58]

49.  The Plan satisfies section 1129(a)(3) of the Bankruptcy Code.  Here, the Plan and the accompanying Restructuring Transactions will enable the Debtors to align vessel-level cash flows at FFTA with their secured debt service obligations and deleverage its balance sheet.  The Restructuring Support Agreement, the Noteholder Plan Support Agreement, the Plan, and all the related documents were negotiated, proposed, and entered into by the Debtors and the respective parties thereto in good faith and from arm's-length bargaining positions, without any collusion,

---

54  *See* 11 U.S.C. § 1129(a)(3).

55  *See In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985).

56  *See In re Block Shim Dev. Company-Irving*, 939 F.2d 289, 292 (5th Cir. 1991).

57  *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984); *B.D. Int'l Disc. Corp. v. Chase Manhattan Bank (In re B.D. Int'l Disc. Corp.)*, 701 F.2d 1071, 1075 n.8 (2d Cir. 1983) ("[T]he two major purposes of bankruptcy [are] achieving equality among creditors and giving the debtor a fresh start.").

58  *E.g., In re T-H New Orleans Ltd. P'ships*, 116 F.3d 790, 802 (5th Cir. 1997) (quoting *In re Sun Country Dev., Inc.*, 764 F.2d at 408); *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012); *In re Century Glove*, Nos. 90-400-SLR, 90-401-SLR, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993).

fraud, or attempt to take unfair advantage of any party. Indeed, the terms of the Noteholder Plan Support Agreement were reached during a multi-day mediation conducted under the supervision of the Court-appointed mediator. The overwhelming support for the Plan from the Voting Parties is strong evidence that the Plan has a proper purpose and is likely to succeed.[59] Finally, as set forth herein, the Plan complies with bankruptcy and applicable nonbankruptcy law. Accordingly, the Plan satisfies section 1129(a)(3) of the Bankruptcy Code.

### D.   The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (Section 1129(a)(4)).

50.   Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be subject to approval by the Court as reasonable.[60] Courts have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the Court as to their reasonableness.[61] The Fifth Circuit has held this is a "relatively open-ended standard" that involves a case-by-case inquiry and, under appropriate circumstances, does not necessarily require that a bankruptcy court review the amount charged.[62] As to routine

---

[59]   *See* Voting Report.

[60]   11 U.S.C. § 1129(a)(4).

[61]   *See In re Cajun Elec. Power Coop.*, 150 F.3d 503, 518 (5th Cir. 1998) (emphasis omitted) (citations omitted) ("Section 1129(a)(4) by its terms requires court approval of any payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case."); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

[62]   *Cajun Elec.*, 150 F.3d at 517 ("What constitutes a reasonable payment will clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate.").

legal fees and expenses that have been approved as reasonable in the first instance, "the court will ordinarily have little reason to inquire further with respect to the amount charged."[63]

51.     The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.  Payment of Professional Claims is the only category of payments that fall within the ambit of section 1129(a)(4) of the Bankruptcy Code in these chapter 11 cases, and the Debtors may not pay Professional Claims absent Court approval.[64]   Further, all such Professional Claims and corresponding payments are subject to prior Court approval and the reasonableness requirements under sections 328 and/or 330 of the Bankruptcy Code.[65]   Article II.C.1 of the Plan, moreover, provides that Professionals shall file all final requests for payment of Professional Claims no later than 45 days after the Effective Date, thereby providing an adequate period of time for interested parties to review such Professional Claims.[66]

### E.     The Debtors Have Complied with the Bankruptcy Code's Governance Disclosure Requirement (Section 1129(a)(5)).

52.     Section 1129(a)(5)(A) of the Bankruptcy Code requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors, to the extent known, of the reorganized debtors.[67]   It further requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[68]   Lastly, it requires that the plan proponent have disclosed the identity of insiders

---

[63]   *Id*.

[64]   *See* Plan, Arts. IA, II.C.

[65]   11 U.S.C. §§ 328(a), 330(a)(1)(A).

[66]   Plan, Art. II.C.I.

[67]   11 U.S.C. § 1129(a)(5)(A)(i).

[68]   *Id.* § 1129(a)(5)(A)(ii).

to be retained by the reorganized debtor and the nature of any compensation for such insider.[69] Courts have held that these provisions ensure that the post-confirmation governance of a reorganized debtor is in good hands.[70]

53.     The Debtors have satisfied section 1129(a)(5) of the Bankruptcy Code.  The Plan provides that, as of the Effective Date, the terms of the current members of the board of directors of Altera GP shall expire, and the new directors and officers of the Reorganized Altera GP shall be appointed.[71]  Corporate governance for Reorganized Altera, including charters, bylaws, operating agreements, or other organization documents, as applicable, shall be consistent with section 1123(a)(6) of the Bankruptcy Code and the New Organizational Documents.[72]  Where specific individuals are not yet known, the Debtors have disclosed the process by which the applicable directors will be selected.  The Debtors believe control of the Reorganized Debtors by the individuals to be appointed in accordance with the Plan and New Organizational Documents will be consistent with public policy.  Therefore, the requirements under section 1129(a)(5)(A)(ii) of the Bankruptcy Code are satisfied.

**F.      The Plan Does Not Require Governmental Regulatory Approval (Section 1129(a)(6)).**

54.     Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has

---

69   *Id.* § 1129(a)(5)(B).

70   *See In re Landing Assocs.,* 157 B.R. 791, 817 (Bankr. W.D. Tex. 1993) ("In order to lodge a valid objection under § 1129(a)(5), a creditor must show that a debtor's management is unfit or that the continuance of this management post-confirmation will prejudice the creditors.").

71   Plan, Art. IV.K.

72   *Id.*

approved any rate change provided for in the plan.[73]  No such rate changes are provided for in the

Plan.[74]  Section 1129(a)(6) of the Bankruptcy Code is therefore inapplicable to these chapter 11

cases.

      **G.**     **The Plan Is in the Best Interests of All the Debtors' Creditors (Section 1129(a)(7)).**

     55.     Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests

test," provides, in relevant part:

> With respect to each impaired class of claims or interests—
>
> (A)    each holder of a claim or interest of such class—
>
>     (i)    has accepted the plan; or
>
>     (ii)   will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date . . . .[75]

     56.     The best interests test applies to individual dissenting holders of impaired claims

and interests—rather than classes—and is generally satisfied through a comparison of the

estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that

debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[76]  As

---

[73]  11 U.S.C. § 1129(a)(6).

[74]  Rush Decl. ¶ 38.

[75]  11 U.S.C. § 1129(a)(7).

[76]  *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Century Glove*, Nos. 90–400–SLR, 90–401–SLR, 1993 WL 239489, at *7 (D. Del. Feb. 10, 1993); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (stating that section 1129(a)(7) is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation").

section 1129(a)(7) of the Bankruptcy Code makes clear, the best interests test applies only to holders of non-accepting impaired claims or interests.  Classes 3, 4, 5(a)–(g), 6(a)–(g), 7, and 8 have voted nearly unanimously in favor of the Plan.  All holders of Claims and Interests in all Impaired Classes, however, will recover at least as much as a result of the confirmation of the Plan as they would in a hypothetical chapter 7 liquidation.[77]   Accordingly, the Plan satisfies section 1129(a)(7) of the Bankruptcy Code and the best interests test.

57.     As set forth in <u>Exhibit E</u> of the Disclosure Statement,[78] the Debtors, with the assistance of their advisors, prepared a liquidation analysis that estimates recoveries for members of each Class under the Plan.  The projected recoveries under the Plan are equal to or in excess of the recoveries estimated in a hypothetical chapter 7 liquidation.[79]  Accordingly, the Plan complies with section 1129(a)(7).

**H.     The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code.**

58.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.[80]  If not, the plan must satisfy

---

[77]   *See In re Neff*, 60 B.R. 448, 452 (Bankr. N.D. Tex. 1985), *aff'd,* 785 F.2d 1033 (5th Cir. 1986) (stating that "best interests" of creditors means "creditors must receive distributions under the Chapter 11 plan with a present value at least equal to what they would have received in a Chapter 7 liquidation of the Debtor as of the effective date of the Plan"); *In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) (citations omitted) ("Section 1129(a)(7)(A) requires a determination whether 'a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization.'").

[78]   Disclosure Statement, <u>Exhibit E</u>.

[79]   *Id.*; Rush Decl. ¶ 19.  Each row in the Liquidation Analysis chart included associated notes that provided further detail and information with respect to the estimated recoveries presented therein.  The full text of these notes is included in <u>Exhibit E</u> of the Disclosure Statement.

[80]   11 U.S.C. 1129(a)(8).

the "cram down" requirements of section 1129(b) with respect to the claims or interests in that class.[81]

59.    Of the Impaired Classes of Claims and Interests under the Plan, all Voting Classes voted to accept the Plan.  Holders of Claims and Interests in Classes 10 and 11 are presumed to accept or deemed to reject the Plan, as applicable, and are proponents of the Plan.  Holders of Claims and Interests in Classes 12, 13, and 14 are Impaired under the Plan and are deemed to have rejected the Plan and thus were not entitled to vote.  Notwithstanding such rejections, the Plan is confirmable nonetheless because it satisfies 1129(b) of the Bankruptcy Code, as discussed below.

**I.    The Plan Provides for Payment in Full of All Allowed Priority Claims (Section 1129(a)(9)).**

60.    Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.[82]    In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.[83]  Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally domestic support obligations, wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such

---

[81]    *Id.* § 1129(b).

[82]    *See id.* § 1129(a)(9).

[83]    *Id.* § 1129(a)(9)(A).

class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).[84]  Finally, section 1129(a)(9)(C) provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim.[85]

61.     The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  ***First***, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each holder of Allowed Administrative Claims receives Cash equal to the amount of such Allowed Administrative Claim on the Effective Date, or as soon as reasonably practicable thereafter, or at such other time defined in Article II.A of the Plan.  ***Second***, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no holders of the types of Claims specified by section 1129(a)(9)(B) are Impaired under the Plan.  ***Third***, Article II.D of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it specifically provides that each holder of an Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.  Thus, the Plan satisfies each of the requirements set forth in section 1129(a)(9) of the Bankruptcy Code.

---

[84]   *Id.* § 1129(a)(9)(B).

[85]   *Id.* § 1129(a)(9)(C).

**J.      At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (Section 1129(a)(10)).**

62.      Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan "without including any acceptance of the plan by any insider."[86]

63.      As set forth above, holders of Claims in Classes 5(a)–(g), Classes 6(a)–(g), and Class 8—which are Impaired Classes under the Plan—voted to accept the Plan independent of any insiders' votes.[87]   The Plan thus satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

**K.      The Plan Is Feasible (Section 1129(a)(11)).**

64.      Section 1129(a)(11) of the Bankruptcy Code requires that the Court find that a plan is feasible as a condition precedent to confirmation.  Specifically, the Court must determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.[88]

To demonstrate that a plan is feasible, it is not necessary for a debtor to guarantee success.[89]  Rather, a debtor must provide only a reasonable assurance of success.[90]  There is a relatively low

---

[86]   *Id.* § 1129(a)(10).

[87]   *See* Voting Report.

[88]   11 U.S.C. § 1129(a)(11).

[89]   *In re T-H New Orleans Ltd P'ship,* 116 F.3d 790, 801 (5th Cir. 1997) (citations omitted) ("[T]he [bankruptcy] court need not require a guarantee of success . . . , [o]nly a reasonable assurance of commercial viability is required."); *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed."); *In re Lakeside Glob. II, Ltd.*, 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989) (noting that the feasibility standard "has been slightly broadened and contemplates whether the debtor can realistically carry out its plan").

[90]   *Kane*, 843 F.2d at 649; *In re Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012); *In re W.R. Grace & Co.*, 475 B.R. 34, 115 (D. Del. 2012); *see also Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (citations omitted) ("The purpose of section 1129(a)(11) is to prevent confirmation of

31

threshold of proof necessary to satisfy the feasibility requirement.[91]  As demonstrated below, the

Plan is feasible within the meaning of section 1129(a)(11) of the Bankruptcy Code.

65.     In determining standards of feasibility, courts have identified the following

probative factors:

a.      the adequacy of the capital structure;

b.      the earning power of the business;

c.      the economic conditions;

d.      the ability of management;

e.      the probability of the continuation of the same management; and

f.      any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[92]

66.     The Plan is feasible.  Upon the Effective Date, the Debtors expect to have sufficient

funds and proceeds from (a) Cash on hand, including Cash from operations, the DIP Facility, and

the proceeds of the Rights Offering, (b) the New Common Stock, (c) the New GP Common Stock,

and (d) the New Warrants, as applicable, to make all distributions contemplated by the Plan.

Following emergence, the Debtors' Financial Projections demonstrate that the Reorganized

Debtors will be well positioned to execute their business plan, service their significantly reduced

---

visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation."); *accord In re Capmark Fin. Grp. Inc.*, No. 09-13684 (CSS), 2011 WL 6013718, at *61 (Bankr. D. Del. Oct. 5, 2011) (same).

[91]  *E.g.*, *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (citations omitted) (quoting approvingly that "[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility"); *Berkeley Fed. Bank & Trust v. Sea Garden Motel & Apartments (In re Sea Garden Motel & Apartments)*, 195 B.R. 294, 305 (D.N.J. 1996); *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011).

[92]  *In re M & S Assocs. Ltd.*, 138 B.R. 845, 849 (Bankr. W.D. Tex. 1992).

debt obligations, and successfully operate their businesses.  By better aligning remaining debt maturities with expected cash flows, and significantly reducing cash debt interest expense, the Plan will provide the Reorganized Debtors with a significantly improved liquidity profile and an improved ability to hit their operational targets and achieve the financial results contemplated in the Financial Projections.  The Plan further contemplates Amended and Restated Bank Facilities on the terms set forth in the Bank Term Sheet that will, among other things, extend the maturities under the Bank Facilities.  Thus, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code.

**L.**     **All Statutory Fees Have Been or Will Be Paid (Section 1129(a)(12)).**

67.     Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."[93]  Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority status.

68.     The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article XII.C of the Plan provides that all fees due and payable before the Effective Date shall be paid in full in Cash on the Effective Date and the Reorganized Debtors and the Distribution Agent shall remain obligated to pay such fees until these chapter 11 cases are converted, dismissed, or closed, whichever occurs first.

---

[93]   11 U.S.C. § 1129(a)(12).

**M.      All Retiree Benefits Will Continue Post-Confirmation (Section 1129(a)(13)).**

69.      Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.[94]

70.      The Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code because Article IV.P of the Plan provides that from and after the Effective Date, all retiree benefits, as defined in section 1114 of the Bankruptcy Code, will be paid in accordance with applicable law.

**N.      Sections 1129(a)(14) Through 1129(a)(16) Do Not Apply to the Plan.**

71.      Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.[95]  Since the Debtors are not subject to any domestic support obligations, the requirements of section 1129(a)(14) of the Bankruptcy Code do not apply.

72.      Likewise, section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as defined in the Bankruptcy Code.[96]  Since the Debtors are not individuals, the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply.

73.      Finally, each of the Debtors are a moneyed, business, or commercial corporation, and therefore, section 1129(a)(16) of the Bankruptcy Code, which provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust be made in accordance with any applicable provisions of nonbankruptcy law,[97] is not applicable to these chapter 11 cases.

---

[94]   *Id.* § 1129(a)(13).

[95]   *Id.* § 1129(a)(14).

[96]   *Id.* § 1129(a)(15).

[97]   *See id.* § 1129(a)(16).

O.    **The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code.**

74.    Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.[98]   To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[99]

75.    The Plan satisfies section 1129(b) of the Bankruptcy Code.  As noted above, all of the Impaired Classes of Claims under the Plan (Classes 3, 4, 5(a)–(g), 6(a)–(g), 7, and 8) voted to accept the Plan.  Notwithstanding the fact that certain Impaired Classes are deemed to have rejected the Plan, the Plan is confirmable.  The Classes that are deemed to reject or may be deemed to reject the Plan consist of:  (1) Intercompany Claims and Interests in Classes 10 and 11, respectively, (of course, the Debtors support the Plan); (2) Existing Preferred Equity Interests in Altera in Class 12 (which consists of out-of-the-money preferred equityholders); (3) Existing Common Equity Interests in Altera Parent in Class 13 (almost entirely held by Brookfield, which strongly supports the Plan); and (4) Section 510(b) Claims in Class 14 (which would be as out-of-the-money as the equity interests to which they relate).

---

[98]    *Id.* § 1129(b)(1).

[99]    *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 157 n.5 (3d Cir. 1993); *Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'Ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 653 (9th Cir. 1997) ("[T]he Plan satisfies the 'cramdown' alternative . . . found in 11 U.S.C. § 1129(b), which requires that the Plan 'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the Plan.").

### 1.   The Plan Is Fair and Equitable (Section 1129(b)(2)(B)(ii)).

76.     A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[100]  The absolute priority rule provides that a junior stakeholder (*e.g.*, an equity holder) may not receive or retain property under a plan of reorganization "on account of" its junior interests unless all senior classes either (a) are paid in full or (b) vote in favor of the plan.[101]

77.     With respect to Impaired Classes that are deemed to have rejected, the Plan satisfies the absolute priority rule.  The Impaired rejecting Classes are Class 12 (Existing Preferred Equity Interests in Altera), Class 13 (Existing Common Equity Interests in Altera Parent), and Class 14 (Section 510(b) Claims), which are deemed to reject the Plan, and Class 10 (Intercompany Claims) and Class 11 (Intercompany Interests) may be deemed to reject the Plan.  The Plan satisfies the absolute priority rule (and is fair and equitable) as to these Classes, because, as to such Classes, there is no Class of equal priority receiving more favorable treatment, and no Class that is junior to such Classes will receive or retain any property on account of the Claims or Interests in such Class.[102]

---

[100]   *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441–42 (1999) ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii).  That latter condition is the core of what is known as the 'absolute priority rule.'").

[101]   *See* 11 U.S.C. § 1129(b)(2)(B)(ii); *see also DISH Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, 634 F.3d 79, 88 (2d Cir. 2011) (citations omitted) (the absolute priority rule "provides that a reorganization plan may not give 'property' to the holders of any junior claims or interests 'on account of' those claims or interests, unless all classes of senior claims either receive the full value of their claims or give their consent"); *In re Armstrong World Indus., Inc.*, 432 F.3d 507, 512 (3d Cir. 2005) (citations omitted) ("Under the statute, a plan is fair and equitable with respect to an impaired, dissenting class of unsecured claims if (1) it pays the class's claims in full, or if (2) it does not allow holders of any junior claims or interests to receive or retain any property under the plan 'on account of' such claims or interests.").

[102]   Rush Decl. ¶ 46.

### 2. The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes that Have Not Voted to Accept the Plan (Section 1129(b)(1)).

78.     Although the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists, courts typically examine the facts and circumstances of the particular case to make the determination.[103]   In general, courts have held that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if it provides materially different treatment for creditors and interest holders with similar legal rights without compelling justifications for doing so.[104]   A threshold inquiry to assessing whether a proposed plan of reorganization unfairly discriminates against a dissenting class is whether the dissenting class is equally situated to a class allegedly receiving more favorable treatment.[105]

79.     Here, the Plan's treatment of the non-accepting Impaired Classes is proper because all similarly situated holders of Claims and Interests will receive substantially similar treatment, and the Plan's classification scheme rests on a legally acceptable rationale.[106]   Thus, the Plan does

---

[103] *In re 203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), *rev'd on other grounds*, *203 N. LaSalle*, 526 U.S. 434 (1999) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established"); *In re Aztec Co.*, 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989) ("Courts interpreting language elsewhere in the Code, similar in words and function to § 1129(b)(1), have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination."); *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

[104] *See In re Idearc Inc.*, 423 B.R. 138, 171 (Bankr. N.D. Tex. 2009) ("[T]he unfair discrimination standard prevents creditors and equity interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so."); *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 661 (Bankr. D. Del. 2003) (permitting different treatment of two classes of similarly situated creditors upon a determination that the debtors showed a legitimate basis for such discrimination); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) (finding no unfair discrimination where the interests of objecting class were not similar or comparable to those of any other class).

[105] *See In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *31 (Bankr. D. Del. May 13, 2010) (citing *In re Armstrong World Indus.*, 348 B.R. at 121).

[106] Claims in the non-accepting Impaired Classes—*i.e.*, Classes 10, 11, 12, 13, and 14—are not similarly situated to any other classes, given their distinctly different legal character from all other Claims and Interests.  The Holders of Interests populating Classes 12 and 13 are preferred shareholders in Altera and common shareholders in Altera

not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code, and the Plan may be confirmed notwithstanding the deemed rejection by the Impaired Classes.

**P.     The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)–(e)).**

80.     The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code.  Section 1129(c) of the Bankruptcy Code, which prohibits confirmation of multiple plans,[107] is not implicated because there is only one proposed Plan.

81.     The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.[108]  Moreover, no governmental unit or any other party has requested that the Bankruptcy Court decline to confirm the Plan on such grounds.[109]  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

82.     Lastly, section 1129(e) of the Bankruptcy Code is inapplicable because none of the Debtors' chapter 11 cases is a "small business case."[110]

83.     In sum, the Plan satisfies all of the Bankruptcy Code's mandatory chapter 11 plan confirmation requirements.

---

Parent, respectively, and Class 14 is Section 510(b) Claims.  Class 10 and Class 11 are Intercompany Claims and Intercompany Interests, respectively.

[107]  *See* 11 U.S.C. § 1129(c).

[108]  Rush Decl. ¶ 48.

[109]  *Id.*

[110]  *See* 11 U.S.C. § 1129(e); *see also id.* § 101(51D)(B) (A "small business debtor" cannot be a member "of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $2,725,625[] (excluding debt owed to 1 or more affiliates or insiders)").

III.   **The Plan's Release, Exculpation, and Injunction Provisions Are Appropriate and Comply with the Bankruptcy Code.**

84.   The Bankruptcy Code identifies various additional provisions that may be incorporated into a chapter 11 plan, including "any other appropriate provision not inconsistent with the applicable provisions of this title."[111]   Among other discretionary provisions, the Plan contains a debtor release, consensual third-party releases, an exculpation provision, and an injunction provision.[112]   These provisions are the product of extensive good faith, arms'-length negotiations, comply with the Bankruptcy Code and prevailing Fifth Circuit law, and should be approved.

85.   The Plan embodies a global compromise and the release of claims and Causes of Action among various parties including, among others, the Debtors, Brookfield, the Consenting Bank Lenders, the Consenting Noteholders, the Committee, and the Debtors' directors, officers, managers, and employees (in their capacities as such).   Specifically, the Plan resolves a series of issues that could have cast uncertainty over the Debtors' restructuring and avoids further protracted and expensive litigation related to confirmation of the Plan.   The hard-fought negotiations between these parties resulted in the execution of the Restructuring Support Agreement and the Noteholder Plan Support Agreement, which are fully incorporated into the Plan as follows and are in the best interests of the Debtors and their Estates:

- ***Restructuring Support Agreement***.   On the Petition Date, the Debtors, Brookfield, and the Consenting Bank Lenders executed the Restructuring Support Agreement, which enables the Debtors to reprofile their obligations owed under the Bank Facilities to better match anticipated vessel-level cash flows, achieve an overall deleveraging through the equitization of more than $1 billion in junior debt obligations (including the IntermediateCo obligations

---

[111]   *Id.* §§ 1123(b)(1)–(6).

[112]   Plan, Art. VIII.

and the Altera Unsecured Notes), and eliminate Altera's preferred and common equity.

- ***Noteholder Plan Support Agreement***.   The Noteholder Plan Support Agreement provides, among other things, that each holder of Altera Unsecured Notes Claims and other General Unsecured Claims against Altera Parent and Altera Finance Corp., receives its Pro Rata share of (i) 13% of the New Common Stock, subject to dilution on account of the Management Incentive Plan, the New Warrants, and the Rights Offering and (ii) subscription rights to participate (or to designate its affiliate to participate) in up to $12.55 million of the New Common Stock offered in the Rights Offering in accordance with the Rights Offering Procedures.

86.    It is undeniable that litigating chapter 11 case disputes with any party to the Restructuring Support Agreement or the Noteholder Plan Support Agreement, including with respect to the existence of potential claims against the Debtors' equity sponsor, Brookfield, would have been complex and time-consuming and could unnecessarily extend the Debtors' stay in chapter 11 while continuing to incur administrative costs.  Factoring in the costs and risks of litigation (and the associated fights over which party would bear such costs and risks), the Debtors, after careful review and investigation with the assistance of their advisors and the independent review and recommendation of the Restructuring Committee, determined in their sound business judgment that the value of prevailing on the merits in cost-intensive litigation with either the Noteholder Ad Hoc Group or Brookfield on whether there were any potential Causes of Action against Brookfield would not exceed the consideration received under the Plan.[113]  As reflected by the overwhelming creditor support for the Plan, which has broadened since the inclusion of the Noteholder Plan Support Agreement, the compromises and settlement under the Plan are the successful result of hard-fought, pre- and postpetition negotiations.

---

[113]  *See* Flaton Decl. ¶¶ 9–12.

87.     The settlement embodied in the Plan contemplates, among other things, the materiality of the releases, exculpations, and injunction provisions with respect to the parties' support of the Plan, the value of potential litigation Claims, and the expenses of litigating such Claims.  Thus, and as set forth more fully below, the releases, exculpations, and injunction provisions, are reasonable under the circumstances, appropriate, and in the best interests of the Debtors, their Estates, and all of the Debtors' stakeholders.

### A.     The Debtor Release Is Appropriate and Complies with the Bankruptcy Code.

88.     Article VIII.C of the Plan sets forth the Debtor releases (the "Debtor Release"). The Debtor Release releases, among others, the Consenting Stakeholders, the Consenting Noteholders, the CoCom and each member thereof, the Committee and each member thereof, each Agent under a Consenting Bank Lenders Credit Agreement, the DIP Agent, the IntermediateCo Agents/Trustees, each of the Consenting Sponsor Entities, and current and former affiliates of the foregoing and certain related parties of the foregoing; *provided*, that, as set forth in the Plan, any Entity that opts out of the releases or that objects to the releases in the Plan (and does not withdraw such objection before Confirmation) shall not be a Released Party.[114]

89.     Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[115]  Accordingly, pursuant to section 1123(b)(3)(A), the Debtors may release Estate Causes of Action as consideration for concessions made by various stakeholders pursuant to the Plan.[116]

---

[114] *Id.* ¶ 14.  The foregoing description is meant as a summary of the operative Plan provisions only.  To the extent there is any conflict between the foregoing summary and the Plan, the Plan shall control.

[115] 11 U.S.C. § 1123(b)(3).

[116] *See, e.g.*, *In re Bigler LP*, 442 B.R. 537, 547 (Bankr. S.D. Tex. 2010) (finding that plan release provision "constitutes an acceptable settlement under § 1123(b)(3) because the Debtors and the Estate are releasing claims that are property of the Estate in consideration for funding of the Plan"); *In re Heritage Org., L.L.C.*, 375 B.R.

In considering the appropriateness of such releases, courts in the Fifth Circuit generally consider whether the release is (a) "fair and equitable" and (b) "in the best interests of the estate."[117]  Courts in this Circuit generally interpret the "fair and equitable" prong, consistent with that term's usage in section 1129(b) of the Bankruptcy Code, to require compliance with the Bankruptcy Code's absolute priority rule.[118]  Courts generally determine whether a release is "in the best interest of the estate" by reference to the following factors:

      a.      the probability of success of litigation;

      b.      the complexity and likely duration of the litigation, any attendant expense, inconvenience, or delay, and possible problems collecting a judgment;

      c.      the interest of creditors with proper deference to their reasonable views; and

      d.      the extent to which the settlement is truly the product of arm's-length negotiations.[119]

Ultimately, courts afford the Debtors some discretion in determining for themselves the appropriateness of granting plan releases of estate causes of action.[120]

90.      The Debtor Release meets the controlling standard.  As an initial matter, the terms of the Debtor Release comply with the Bankruptcy Code's absolute priority rule.  While certain Classes are deemed to have rejected the Plan, the Debtor Release and settlements embodied

---

230, 259 (Bankr. N.D. Tex. 2007); *In re Mirant Corp.*, 348 B.R. 725, 737–39 (Bankr. N.D. Tex. 2006); *In re Gen. Homes Corp.*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991).

[117]  *In re Mirant Corp.*, 348 B.R. at 738; *see also In re Heritage Org.*, 375 B.R. at 259.

[118]  *In re Mirant Corp.*, 348 B.R. at 738.

[119]  *Id.* at 739–40 (citing *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 355–56 (5th Cir. 1997)).

[120]  *See In re Gen. Homes Corp.*, 134 B.R. at 861 ("The court concludes that such a release is within the discretion of the Debtor.").

42

therein, and in the Plan, do not result in any junior Classes receiving or retaining any property on account of junior Claims or Interests.  Thus, the Debtor Release is fair and equitable in line with Fifth Circuit precedent.

91.     In addition to being fair and equitable, the Debtor Release is in the best interest of the Estates.  ***First***, key stakeholders were extensively involved in the negotiation process that led to the Restructuring Support Agreement, the Plan, and the Noteholder Plan Support Agreement, and the extensive support for the Plan among the Debtors' major stakeholders.[121]  In particular, the restructuring embodied in the Plan (including the Debtor Release) was negotiated by sophisticated parties and counsel, including months of prepetition negotiations among the Debtors, Brookfield, and the various creditor constituencies that resulted in the Restructuring Support Agreement, as well as postpetition negotiations among the parties to the Restructuring Support Agreement, the Noteholder Ad Hoc Group and the Committee, culminating in the multi-day mediation negotiations that resulted in the Noteholder Plan Support Agreement.[122]  ***Second***, the Debtor Release is an essential *quid pro quo* for the Released Parties' contributions to and support of the Debtors' restructuring. [123]  ***Third***, the Plan, including the Debtor Release contained therein, is supported by 100% of the Debtors' Bank Lenders, Brookfield (which is both the Debtors' DIP lender and their single largest prepetition creditor), and the Noteholder Ad Hoc Group.[124]  ***Fourth***, the Restructuring Committee considered the costs, delay, and inconveniences that would result from litigating the causes of action against the Released Parties covered by the Debtor Release as

---

[121]   Flaton Decl. ¶ 15.

[122]   *Id.*

[123]   *Id.*

[124]   *Id.*

compared against any potential value of such causes of action. [125]   The Restructuring Committee concluded that the costs and uncertainties of litigating any Claims against the Released Parties were far outweighed by the benefits of the global settlement reflected in the Plan.[126]   Accordingly, the Debtor Release is fair, equitable, and in the best interest of their Estates, is justified under the controlling Fifth Circuit standard, and should be approved.

**B.    The Third Party Release Is Appropriate and Complies with the Bankruptcy Code.**

92.    Article VIII.D of the Plan contains a third-party release provision (the "Third Party Release").  It provides that each Releasing Party—including all holders of Claims and Interests who do not specifically opt out to their inclusion as a Releasing Party—and Related Parties shall release any and all Causes of Action (including a list of specifically enumerated claims) such parties could assert against the Debtors, the Reorganized Debtors, and the Released Parties.[127]

93.    While the Fifth Circuit has not directly addressed what constitutes a consensual third-party release, the *Republic Supply*[128] court found that the Bankruptcy Code does not preclude a third-party release provision where "it has been accepted and confirmed as an integral part of a plan of reorganization."[129]  *Republic Supply* and its progeny[130]  ultimately stand for the proposition

---

[125] *Id.*

[126] *Id.*

[127] The foregoing description is meant as a summary of the operative plan provisions only.  Certain of the Releasing Parties are defined as such in multiple capacities.  To the extent there is any conflict between the foregoing summary and the definition of "Releasing Party" contained in Article I of the Plan, the Plan shall control.

[128] *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987).

[129] *Id.*

[130] *See,* e.g., *Hernandez v. Larry Miller Roofing, Inc.*, 628 Fed. App'x 281, 286–88 (5th Cir. 2016); *FOM Puerto Rico, S.E. v. Dr. Barnes Eyecenter, Inc.*, 255 Fed. App'x 909, 911–12 (5th Cir. 2007); *Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.)*, 203 F.3d 914, 919 (5th Cir. 2000).

that "[c]onsensual nondebtor releases that are specific in language, integral to the plan, a condition

of settlement, and given for consideration do not violate" the Bankruptcy Code.[131]  At the core of

the analysis is whether the third-party release is consensual.

94.     Bankruptcy courts in Texas have applied this standard, in recent chapter 11

bankruptcies, when approving third-party releases similar to this Third Party Release.  In doing so,

these courts have focused on *process—i.e.*, whether "notice has gone out, parties have actually

gotten it, they've had the opportunity to look it over, [and] the disclosure is adequate so that they

can actually understand what they're being asked to do and the options that they're being given."[132]

Ultimately, these courts acknowledge that parties in interest waive their rights with respect to a

third-party release if they vote to accept the Plan or do not opt out of the releases.[133]

95.     The Third Party Release meets this standard.  As a threshold matter, the Third Party

Release is ***consensual***.  Parties in interest were provided extensive notice of these chapter 11

proceedings, the Plan, the deadline to object to confirmation of the Plan, and the ability to opt out

---

[131] *In re Wool Growers*, 371 B.R. 768, 776 (N.D. Tex. 2007) (citing *Republic Supply*, 815 F.2d at 1050); *see also Dr. Barnes Eyecenter*, 255 Fed. App'x at 911–12.

[132] Confirmation Hr'g Tr. at 47, *In re Energy & Exploration Partners, Inc.*, No. 15 44931 (Bankr. N.D. Tex. April 21, 2016) [Docket No. 730] (hereinafter "ENXP Tr."); *see also* Confirmation Hr'g Tr. at 32, *In re Ameriforge Group, Inc.*, No. 17-32660 (Bankr. S.D. Tex. May 24, 2017) [Docket No. 144]; Confirmation Hr'g Tr. at 7–8, *In re Hornbeck Offshore Servs., Inc.*, No. 20-32679 (Bankr. S.D. Tex. June 19, 2020) [Docket No. 227].

[133] ENXP Tr. at 47 ("[T]he [*Republic Supply*] case being that the Debtor is authorized, I think, I don't think there's anything that's necessarily bad faith about the Debtor putting release provisions like this into a plan.  And if we assume that the Debtor has otherwise satisfied procedural due process . . . and then they choose not to participate one way or the other, can they be bound by it?  I would say that this is one of those situations where [*Republic Supply*] says those people can waive substantive rights by not affirmatively participating in the case."); *In re Southcross Holdings, LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. April 11, 2016), Hr'g Tr. at 42 (approving as consensual a third party release provision in favor of the debtors' prepetition equity sponsors that bound all holders of claims and interest).

of the Third Party Release.[134]   Parties in interest not entitled to vote on the Plan were provided

notice, which expressly apprised such parties of the existence of the Third Party Release and their

ability to opt out of the release or object to the release if they did not wish to be bound.[135]   In

particular, an option to check a box to opt out of the Third Party Release was included in both the

ballots and the Notice of Non-Voting Status and Opportunity to Opt Out, together with a

pre-addressed postage-paid return envelope for non-voting parties, meaning every known

stakeholder, including Unimpaired creditors and equity interest holders of record, were actually

served with the means by which they could opt out of the Third Party Release.   Courts have

approved similar release provisions when parties received sufficient notice of their ability to opt

out or object to the release.[136]

96.     In addition to being consensual, the Third Party Release satisfies the other factors

referenced in *Republic Supply* and its progeny.   ***First***, the Third Party Release is sufficiently

specific—listing potential Causes of Action to be released—so as to put the Releasing Parties on

---

[134]   *See* Disclosure Statement Order; *Certificates of Service* (Notice of Bar Date, POC Form, and Combined Hearing Notice) [Docket Nos. 454, 467, 488]; *Affidavits of Publication* [Docket Nos. 461 and 462]; *Certificates of Service of Solicitation Materials* [Docket Nos. 455, 504, 505].

[135]   *See Certificates of Service of Non-Voting Status and Out of Releases* [Docket Nos. 455, 468, 489, 499, 504, 505].

[136]   *See In re Carlson Travel, Inc.*, No. 21-90017 (MI) (S.D. Tex. Nov. 12, 2021) ("[T]he Third-Party Release was integral to the formulation of the Plan . . . The Combined Hearing Notices sent to Holders of Claims and Interests, the Publication Notices, the Ballots sent to all Holders of Claims and Interests entitled to vote on the Plan, and the Opt-Out Notices served on all Holders of Claims in the Unimpaired Classes and on the Supplemental Solicitation Noteholders, in each case, unambiguously stated that the Plan contains the Third-Party Release and informed parties in interest of their ability to opt out of the Third-Party Release."); *In re Genon Energy*, Inc., No. 17-33695 (DRJ) (S.D. Tex. Dec. 12, 2017) (approving the Third-Party Release because it allowed opt-out and "the release provisions of the Plan were conspicuous, emphasized with boldface type in the Plan, the Disclosure Statement, the ballots, and the applicable notices"); *In re Katerra, Inc.*, No. 21-31861 (DRJ) (S.D. Tex. Oct. 21, 2021) (same); *In re Neiman Marcus Grp. LTD LLC*, No. 20-32519 (DRJ) (S.D. Tex. Sept. 04, 2020) (same); *In re Ultra Petroleum Corp.*, No. 16-32202 (MI) (S.D. Tex. Mar. 14, 2017) ("[T]he Third Party Release is consensual as the parties in interest were provided notice of the chapter 11 proceedings, each Plan, and the deadline to object to confirmation of the Plan [and] were given the opportunity to opt out of the Third Party Release, and the release provisions of each Plan were conspicuous, emphasized with boldface type in each Plan, each Disclosure Statement, and the applicable ballots.").

notice of the released claims.[137]  **Second**, the Third Party Release is integral to the Plan and a condition of the comprehensive settlement embodied therein.[138]  The provisions of the Plan and Restructuring Support Agreement were heavily negotiated prepetition.  The Third Party Release (together with the Debtor Release) are key components of the Debtors' restructuring and key inducement to bring stakeholder groups to the bargaining table.  Put simply, the Debtors' key stakeholders are unwilling to support the Plan without the assurance that they and their collateral would not be subject to post-emergence litigation or other disputes related to restructuring.  The Third Party Release therefore not only benefits the non-Debtor Released Parties, but also the Debtors' post-emergence enterprise as a whole.

97.    **Third**, the Third Party release was given for consideration.   The significant consideration provided by the Released Parties inured not only to the benefit of the Debtors as described above, but inured to the benefit of all stakeholders by allowing the chapter 11 cases to efficiently proceed and, thus, maximize the value of the Debtors' business.  All parties in interest benefit from the restructuring transactions contemplated by the Plan, which will greatly improve the Debtors' liquidity profile and position them for future success.  However, the *quid pro quo* for the contributions, concessions, and support offered by the Released Parties under the Plan is the Third Party Release.

98.    Accordingly, the Debtors submit that the Third Party Release should be approved.

---

[137]  Plan, Art. VIII.D (specifically describing the nature and type of claims released); Art. I.A (specifically describing the parties released).

[138]  *See* Flaton Decl. ¶ 16.

**C.     The Exculpation Provision Is Appropriate and Complies with the Bankruptcy Code.**

99.     Article VIII.E of the Plan provides that each Exculpated Party—*i.e.*, (a) each of the Debtors; (b) each independent director of any Debtor entity; and (c) the Committee and each of its members—shall be released and exculpated from any Cause of Action arising out of acts or omissions in connection with these chapter 11 cases and certain related transactions, except for acts or omissions that are found to have been the product of actual fraud, willful misconduct, or gross negligence (the "Exculpation Provision").[139]

100.     At the outset, it is important to underscore the difference between the Third Party Release and the Exculpation Provision.  Unlike the Third Party Release, the Exculpation Provision does not affect the liability of third parties *per se*, but rather sets a standard of care of gross negligence or actual fraud in hypothetical future litigation against an Exculpated Party for acts arising out of the Debtors' restructuring.[140]  A bankruptcy court has the power to approve an exculpation provision in a chapter 11 plan because a bankruptcy court cannot confirm a chapter 11 plan unless it finds that the plan has been proposed in good faith.[141]  As such, an exculpation provision represents a legal conclusion that flows inevitably from several different findings a bankruptcy court must reach in confirming a plan.[142]  Once the court makes its good faith finding, it is appropriate to set the standard of care of the fiduciaries involved in the formulation of that

---

[139]  The foregoing description is meant as a summary of the operative plan provisions only.  To the extent there is any conflict between the forgoing summary and the definition of "Exculpated Party" contained in Article I of the Plan, the Plan shall control.

[140]  *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (holding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code").

[141]  *See* 11 U.S.C. § 1129(a)(3).

[142]  *See id.* § 157(b)(2)(L).

chapter 11 plan.[143]   Exculpation provisions, therefore, appropriately prevent future collateral attacks against fiduciaries of the Debtors' Estates.

101.    Here, the Exculpation Provision in the Plan is an integral piece of the overall settlement embodied by the Plan.[144]  It is limited to parties who have performed valuable services in connection with the Debtors' restructuring, and is the product of good faith, arm's-length negotiations.[145]  The Exculpation Provision is narrowly tailored to exclude acts of actual fraud, willful misconduct, or gross negligence, and relates only to acts or omissions in connection with, or arising out, of the Debtors' restructuring.[146]  Additionally, no party has specifically objected to the Exculpation.  As such, the Exculpation Provision is a critical component of the Plan, and along with the Debtor Release, forms an integral piece of the overall settlement embodied in the Plan.[147]

### D.    The Injunction Provision Is Appropriate and Complies with the Bankruptcy Code.

102.    The injunction provision set forth in Article VIII.F of the Plan (the "<u>Injunction Provision</u>") is a necessary part of the Plan because it enforces the discharge, release, and exculpation provisions that are critically important to the Plan.[148]  The Injunction Provision affords the Debtors and their stakeholders (including, among others, the Released Parties and the Exculpated Parties) a greater degree of certainty with respect to the chapter 11 cases and the

---

[143]   *See In re PWS Holding Corp.*, 228 F.3d at 246 (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties").

[144]   Flaton Decl. ¶ 17.

[145]   *Id.*

[146]   *Id.*

[147]   *Id.*

[148]   *Id.* ¶ 18.

Restructuring Transactions by requiring the Court's authorization for parties to commence or pursue Claims or Causes of Action that relate to or are reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to the Debtor Release, the Third-Party Release, or the Exculpation.[149]   Finally, the Injunction Provision is consensual as to any party who did not specifically object to it.[150]   As such, to the extent the Court finds that the Plan's Exculpation and Release Provisions are appropriate, the Court should approve the Injunction Provision.[151]

## WAIVER OF BANKRUPTCY RULE 3020(E)

103.    To implement the Plan, the Debtors seek a waiver of the 14-day stay of an order confirming a chapter 11 plan under Bankruptcy Rule 3020(e).   These chapter 11 cases and the Restructuring Transactions contemplated in the Plan have been negotiated in good faith, implemented with a high degree of transparency, and premised on preserving the value of the Debtors as a going concern.   The Debtors' swift emergence from chapter 11 is an important component of their restructuring, and requiring the Debtors to pause before confirmation would be prejudicial to all parties in interest that continue to incur the cost and expense of the Debtors' chapter 11 cases.   For these reasons, the Debtors request a waiver of stay imposed by the Bankruptcy Rules so that the Confirmation Order may be effective immediately upon its entry.

---

[149]  *Id.*

[150]  *Id.*

[151]  *See, e.g.*, *In re Camp Arrowhead, Ltd.*, 451 B.R. 678, 701–02 (Bankr. W.D. Tex. 2011) ("[T]he Fifth Circuit does allow permanent injunctions *so long as there is consent*.   Without an objection, this court was entitled to rely on . . . silence to infer consent at the confirmation hearing . . . ." (citing *Pac. Lumber*, 584 F.3d at 253)).

## <u>CONCLUSION</u>

104.    For all of the reasons set forth herein, and as will be further shown at the Combined Hearing, the Debtors request that the Court approve the Disclosure Statement and confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the Proposed Confirmation Order and granting such other and further relief as is just and proper.

Houston, Texas
November 3, 2022

/s/ *Rebecca Blake Chaikin*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Kristhy M. Peguero (TX Bar No. 24102776)
Rebecca Blake Chaikin (S.D. Bar No. 3394311)
Victoria N. Argeroplos (TX Bar No. 24105799)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          mcavenaugh@jw.com
Email:          kpeguero@jw.com
Email:          rchaikin@jw.com
Email:          vargeroplos@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Brian Schartz, P.C. (TX Bar No. 24099361)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                brian.schartz@kirkland.com

- and -

John R. Luze (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          john.luze@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

## <u>Certificate of Service</u>

I certify that on November 3, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Rebecca Blake Chaikin*
Rebecca Blake Chaikin