IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| In Re:<br><br>ALTERA INFRASTRUCTURE L.P., et al.<br><br>Debtors. | Chapter 11<br><br>Case No. 22-90130 (MI)<br><br>(Jointly Administered)<br><br>Request to reject proposed THIRD AMENDED DISCLOSURE DOCUMENT and SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION of ALTERA INFRASTRUCTURE L.P. AND ITS DEBTOR AFFILIATES |

**REQUEST TO REJECT PROPOSED THIRD AMENDED DISCLOSURE DOCUMENT AND SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF ALTERA INFRASTRUCTURE L.P. AND ITS DEBTOR AFFILIATES**

1. Synopsis: The proposed reorganization plan should be rejected because it is neither fair nor equitable to the preferred shareholders and thus fails to meet the requirements of §1129 of the Bankruptcy Code.[1] This inequitable treatment can be cured by amending the plan to provide New Preferred Warrants to the preferred shareholders with a strike price of $1,609 million. The New Preferred Warrants would expire worthless at the value implied by the low-balled projections in the plan, yet in-the-money at more realistic projections. This prepackaged bankruptcy represents a sweetheart deal in which the controlling shareholder also owns substantial debt and negotiated mostly with itself to freeze out the preferred shareholders, and thus requires additional judicial scrutiny. The plan's proposal to leave the general unsecured creditors unimpaired is strong evidence that the proponents believe there is sufficient value to pay off the unsecured creditors in full. This implies that there is likely to be at least a little leftover that rightfully belongs

---

[1] The plan and the disclosure document can be found at https://cases.stretto.com/altera/court-docket/court-docket-category/1235-plan-disclosure-statement/.

to the next-in-line classes, including the preferred shareholders. Issuing the proposed New Preferred Warrants to the preferred shareholders will cost the other claimants nothing if the plan's low-ball projections are accurate. If the proponents believe their own numbers, they should not oppose such fair treatment of the preferred shareholders. Any opposition to providing New Preferred Warrants to the preferred shareholders would be strong evidence that the proponents don't believe their own numbers, which in itself should lead to rejection of the plan.

2. I am the beneficial owner of 100 shares of Altera Preferred Class A (ALIN PRA) and 100 shares of Altera Preferred Class B (ALIN PRB). Although I speak only for myself, I am confident that most of my fellow preferred shareholders have similar views. We preferred shareholders are in Class 12 under the proposed plan.[2] Under the proposed plan, our preferred shares will be cancelled and we will have no distributions.

3. I am appearing *pro se* and have not been engaged by any of the parties in this case. As I am not now, nor have I ever been, an attorney, I pray that the court overlook and waive any minor procedural defects in my filing.

4. I am a tenured finance professor at Georgetown University where I have taught for over 25 years. Among other courses, I teach Investments and Fixed Income Securities at Georgetown. I have served as an expert financial witness in a number court cases and FINRA arbitrations, and have testified six times before Congressional committees on financial market issues. I earned a Ph.D. in finance from the University of California at Berkeley, and am a Chartered Financial Analyst (CFA), and a Certified Financial Planner (CFP®). I also am the academic director for FINRA's Certified Regulatory and Compliance Professional (CRCP) program at Georgetown.

**The court should reject this expropriation of value from the preferred shareholders.**

5. I urge the court to reject this grossly unfair expropriation of value from the preferred shareholders as it is neither fair nor equitable and discriminates unfairly against preferred shareholders. Accordingly, I urge the court to reject the proposed plan of reorganization as well as the proposed disclosure document.[3] This prepackaged bankruptcy

---

[2] According to the proposed plan, the Debtors had issued approximately $408 million in preferred stock. See page 37 of the plan.

[3] I am sure the Court is well aware of the law, but other readers may wish to see §1129 of the Bankruptcy Code, which states that "… the court, on request of the proponent of the plan, shall confirm the plan … if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." I will show why this plan is neither fair nor equitable because it unduly enriches the debt

represents a sweetheart deal in which Brookfield and the other debtors appear to have conspired to shut out the preferred shareholders.

### Brookfield's Conflicts of Interest Require Extra Judicial Scrutiny

6. In a normal bankruptcy proceeding, the common shareholders and the debtors are in adversarial positions. As the firm's management in the initial phase of the bankruptcy is still in control of the firm, and has the right to propose a plan of reorganization, the common shareholders are represented. Management in its negotiations has a strong incentive to salvage whatever value it can for the common shareholders and so that the executives can keep their jobs. As preferred shares are senior to the common shares, this generally provides some protection to the preferred shareholders.

7. This case is different from the typical case. Brookfield controls almost all of the equity as well as a substantial portion of the debt.[4,5] Thus, Brookfield was often negotiating with itself in designing this prepackaged deal. As far as I can tell, no one was or is representing the numerous small investors like myself who have purchased preferred shares.

### Brookfield as the underwater equity holder as well as debt holder has an economic incentive to shaft the preferred shareholders.

8. Altera is clearly in financial distress and a restructuring of its capital structure is in order. It is likely that the value of the debtor's assets less its liabilities is less than the $408 million par value of the outstanding preferred stock. This implies there is nothing left for the common shareholders. However, it is not clear that the value of the reorganized firm's assets is less than its liabilities, which would leave something for the preferred shareholders.

---

holders such as Brookfield who will walk away with value more than the amount of their debt claims while the preferred shareholders are shafted.

[4] According to the most recent 20-F filing with the SEC, Brookfield owns 98.7% of the Class A and Class B units. See https://www.sec.gov/ix?doc=/Archives/edgar/data/0001382298/000138229822000006/too-20211231.htm#ia088afc9d13544549af69f665ccd0786_196, page 58.

[5] One of the many defects in the disclosure document is that it does not clearly communicate the extent of Brookfield's debt holdings and influence over the plan. However, one can see from page 46 of the disclosure that Brookfield extended $699 million of Brookfield-held debt and turned it into secured debt, giving it a higher priority in a likely bankruptcy.

9. Brookfield's equity interest could be of little value except that it controls the company and has a leading role in the bankruptcy process. Brookfield s also a major creditor. Unlike in a normal reorganization where the debt holders can, at best, salvage from value from the corpse of the bankrupt entity, in this situation Brookfield and the other creditors can increase the value of their debt holdings through the proposed reorganization plan. By grabbing the equity of the reorganized firm, the debtholders are not only made whole, they also grab any value that should have accrued to the preferred shareholders. It would be highly discriminatory and inequitable for this to happen while the preferred shareholders get nothing.

10. Note once again that in a "normal" bankruptcy, the common shareholders are diluted or wiped out. In this one, Brookfield, the major common equity shareholder, emerges once again as the major common equity shareholder. Hmmmm……

11. All of the creditors who are willing to take equity have an incentive to undervalue the company in order to get more equity.

12. The following graphic (not drawn to scale) illustrates the likely situation. The first column on the left represents the claims against the firm's assets, with the debtholders (Classes 1-11) in red and the preferred (Class 12) in yellow. The value of the firm's assets is represented in the second column. The value of the assets is greater than the total debt, but less than the combined sum of the debt and the preferred shares. The proposed plan (on the right) gives all of the resulting value to the debt holders (in red), shafting the preferred shareholders:

*[Chart showing Pre-petition claim (Preferred and Debt portions) vs. Value of Assets vs. Proposed Plan, with handwritten annotation: "Old creditors get everything under proposed plan."]*

### The Conflicted Valuation Lowballs the Total Enterprise Value.

13. The "disclosure" document and the valuation analysis provide little documentation of the valuation performed. The financial projections are in Exhibit F and the valuation analysis is in Exhibit G of the disclosure document. While the valuation analysis purports to use several different valuation methods to determine its valuation, there is no supporting documentation which would allow the reader to judge the reasonableness of the valuation metrics. The Sum of the Parts provides no detail on the valuation of the different operating segments in the "sum of the parts" or how they were determined. The Discounted Cash Flow (DCF) gives no supporting information on how the terminal value or cost of capital were calculated. The Peer Group Companies Trading Multiple provides no list of peer group companies or their multiples. As one who has graded hundreds of MBA valuation reports, I would assign a failing grade to any report that left out such basic information. The plan thus fails the basic requirements for a disclosure document, yet contains hundreds of pages of dense boilerplate legalese. Providing the details of the valuation in a clear and straightforward manner, along with a clear explanation of the financial projections, would cure the defects in the disclosure document.

14. The valuation of the reorganized firm is based on calculations reported in Exhibit F. The resulting numbers are based on low estimates that directly contradict other statements in the disclosure document. In particular, page 34 of the disclosure document reports that Altera owns 41 vessels:[6]

> **2. Altera's Fleet.**
>
> With the Company's fleet of 41 vessels including (a) FPSO units; (b) FSO units; (c) Towage units; (d) an Accommodation unit; and (e) shuttle tankers, Altera primarily serves its customers in the offshore regions of the North Sea, Brazil, and the East Coast of Canada.

**The Financial Projections Conveniently Ignore 19.5% of the Fleet**

15. Yet the financial projections in Exhibit F only count, without explanation, revenue from 33 vessels:[7]

> **Summary of Significant Assumptions with Respect to the Projected Income Statement**
>
> **1. Vessel Count**
>
> The table below presents Management's forecast for revenue generating vessels over the Projection Period which supports forecast revenues and expenses:

| Revenue Generating Vessels (at year-end) | 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|
| Shuttle Tankers | 22 | 22 | 21 | 21 | 21 |
| FFTA | 11 | 9 | 9 | 11 | 12 |
| Total Vessels | 33 | 31 | 30 | 32 | 33 |

16. Thus, the estimates are based on only 33/41 or 80.5% of the company's fleet, conveniently ignoring 19.5% of their vessels. With underestimates like this, it is likely that the rest of the projections are similarly low-balled.

**The Unaudited Financial Projections Project EBITDA That Is Substantially Lower Than the Firm's Last 12 Months of Reported EBITDA in SEC filings.**

---

[6] This statement is also repeated on page one of the document.

[7] See page 3 of Exhibit F to the disclosure document, page 373 of the 430-page file.

17. Earnings Before Interest, Taxes, Depreciation and Amortization (EBITDA) is one of the basic metrics used in valuation models. One standard valuation tool is to calculate the Total Enterprise Value (TEV) as a multiple of EBITDA. The multiple to be used is based on the Total Enterprise Value to /EBITDA multiples from a group of comparable firms. One can then estimate the Total Enterprise Value (the value of a company's assets before it is divided up into equity and debt claims against the company) by multiplying the EBITDA by the multiple obtained from the comparable firms.

18. The forecasts in Exhibit F predict an EBITDA of $280 million for 2023 and 2024. This is significantly lower than the $630 million in adjusted EBITDA that the firm has reported for its last 12 months of operations in its SEC filings.[8] Thus, the plan projects without explanation an EBITDA only 44% of what Brookfield has been recently claiming for the firm in its SEC filings.

19. In the valuation analysis in Exhibit G states: "Evercore estimates the total enterprise value of the Reorganized Debtors to be between approximately $2,392 million and $2,772 million as of an assumed Effective Date of December 31, 2022, with a midpoint of $2,582 million."

20. The combination of the Total Enterprise Value and the EBITDA calculations can be used to back out the Total Enterprise Value (TEV) to EBITDA multiple implied by the valuation analysis:

21. For the midpoint of the range:

$$\text{TEV/EBITDA} = \text{Evercore's midpoint value estimate divided by forecast EBITDA}$$

$$= \$2{,}582/\$280 = 9.22.$$

22. The upper and lower values of Evercore's valuation range imply EBITDA multiples of 8.54 and 9.90.[9] These numbers are believable as it they comparable to the TEV/EBITDA multiples of many public companies.

---

[8] These are from the quarterly SEC filings from third quarter of 2021 through the second quarter of 2022.
[9] $2,392/$280 = 8.54 and $2,772/$280 = 9.90

**Plausible Differences in Assumptions about EBITDA and TEV/EBITDA Multiples Show That the Value Could Be High Enough to Warrant Consideration for the Preferred Shareholders.**

23. Using the proposed plan's implied range of estimates of the TEV/EBITDA multiples, let us see what range of estimates of Total Enterprise Value are plausible and the implications for what value is left for the preferred shareholders. The methodology is to estimate Total Enterprise Value by applying the implied multiples in the plan to a range of plausible EBITDA values, then subtracting the estimated liabilities.

24. For estimated liabilities, I use the $3,691 million of pre-petition debt obligations from page 47 of the 430-page disclosure document. The document does not clearly communicate an estimate of all the other liabilities, another glaring deficiency which should be remedied. In addition, to the pre-petition debt, I estimate the other liabilities at $500 million. This is based on the $439 million of accounts payable and other financial liabilities in the most recent SEC filing, rounded up to take into account bankruptcy expenses.[10] This creates total liabilities of $4,191 million.

25. Using the plan's implied EBITDA multiple range of 8.54 to 9.90 and Altera's last 12 months of reported EBITDA of $630.7 million provides an estimated TEV range of $5,388 to $6,244. Subtracting the estimated total liabilities of $4,191 leaves an equity value of $1,197 to $2,053 million. This is more than enough to satisfy the $408 million of preferred shares.

26. Of course, the proponents of the plan will assert that the slimmed down post-reorg firm will earn less. However, the "disclosure" document provides little to no information about this or any method for estimating how much less, which alone is grounds for rejection of the plan. However, there is a clue in the number of vessels used in the projection. As mentioned above, the plan without explanation only estimates that 33 of the 41 (80.5%) vessels will generate revenue. If we apply this 80.5% ratio to the $630.7 million from the 12 previous months of reported EBITDA, we get an EBITDA of $508 million and a TEV range of $4,337 to $5,026. Subtracting the liabilities provides a range of $146 to $835 available to cover the $408 million of the preferred shareholders.

27. My objective is not to get into a "battle of the experts" over valuation details. The purported disclosure document does not provide enough information to document a thorough valuation. My objective is to point out that plausible

---

[10] https://www.sec.gov/Archives/edgar/data/1382298/000138229822000020/altera6-kq2x22doc.htm

assumptions implied by the proposed disclosure document and Altera's public filings with the SEC indicate that there is a very good chance that there is sufficient value in the reorganized firm to warrant making some distribution to the preferred shareholders.[11]

### Providing "New Preferred Warrants" to the Preferred Shareholders Would Make the Plan Fair and Equitable and Resolve This Objection.

28. Warrants provide an excellent method for dealing with the uncertainties over valuation. If the resulting entity really has a low value, then the warrants will expire worthless. If the resulting entity has a high value, then the warrants will be "in the money."

29. The "New Warrants" in the proposed plan for the debtholders are 5-year warrants convertible into 5.0% of the New Common Stock, subject to dilution on account of the Management Incentive Plan, struck at a total equity value of Reorganized Altera of $1,041 million.

30. Among the many other defects in the Disclosure Document, there is no clear explanation of where the $1,041 million came from. The Valuation Analysis in Exhibit G has a midpoint valuation of the equity of $363 million.

31. The willingness of debtholders to accept the New Warrants is additional strong evidence that they expect them to be worthwhile and the reorganized entity to achieve an equity value above the $1,041 strike price. Recall that the Valuation Analysis estimated the midpoint of its equity valuation range at $363 million. Thus, the New Warrants will only have value if the equity is worth nearly three times the purported value in the disclosure document. Their use in this case with such a high strike price indicates that the drafters of this plan expect the equity to be quite valuable.

32. Another way to look at the $1,041 strike price for the five-year New Warrants is to examine the inferred rate of return needed for them to expire "in the money." In other words, what is the rate of return needed for the present value of

---

[11] As management is severely liable for misrepresentations made in SEC filings, I tend to assign more credibility to their SEC filings than to the projections found in the proposed disclosure document.

$363 to grow to the future value of $1,041 in five years? This is a simple time value of money problem in finance: The rate of return r is needed to make the future value equal the grown present value:

$$\text{Future\_value} = \text{Present\_value} * (1+r)^5$$

$$\$1{,}041 = \$363*(1+r)^5$$

$$r = 23.46\%$$

33. In other words, the value of the equity will have to grow in value at a rate over twice the long-term return on equities.[12] Another way to look at it is that the controlling equity owners that sailed the ships into bankruptcy will deliver Warren Buffett-like returns for five years.

34. Providing a different series of warrants to the preferred shareholders with an appropriate strike price will make the plan of reorganization fairer and more equitable. Such "New Preferred Warrants" would have a higher strike price than the New Warrants given to the debt holders, reflecting the lower priority of the preferred shares. If the resulting company is not worth much, the preferred shareholders will get what we deserve, which is nothing. If the reorganized company survives but is not too successful, the debtholders get a proper payoff but the preferred shareholders would not get anything, in keeping with the standard priority rules. On the other hand, if the reorganized firm is very successful, the preferred shareholders will rightfully share in the upside of the firm through the exercise of the warrants.

35. The lack of clear disclosure in the "disclosure" document makes it difficult to determine what strike price and equity participation amount are fair. The strike price of the New Preferred Warrants should be above the strike price for the New Warrants provided to the debt holders. This will allow a full payoff to the debt holders who accept equity with the New Warrants.

36. One way to determine the fair strike price is to determine what would make Classes 1 to 11 whole in present value terms. In order to be extremely conservative, I will assume for the sake of calculation (without necessarily agreeing

---

[12] The S&P500 has returned an average of 11.82% from its inception in 1928 through the end of 2021. See https://www.investopedia.com/ask/answers/042415/what-average-annual-return-sp-500.asp

with) the midpoint of the plans Total Enterprise Value of $2,582. With liabilities of $4,191 million (again a guesstimate subject to refinement), the plan implies that the debt holders have experienced a loss in value of $2,582 - $4,191 = $1,609 million. I thus recommend that the strike or exercise price of the New Preferred Warrants be set at an equity value of $1,609 million for 5% of the equity of the reorganized firm.[13]

37. Note that this proposed exercise price for the New Preferred Warrants is 54.6% higher than the $1,046 million exercise price of the New Warrants. Should the value of the equity reach this level, the debtholders will have been made much more than whole. More realistic estimates of value would likely lead to a much lower exercise price for the New Preferred Warrants.

### The "New Preferred Warrants" Will Expire Worthless if the Proponents' Forecasts are Correct and Thus Cost Classes 1-11 Nothing.

38. If the proponents of the plan's low-balled numbers are correct, the New Preferred Warrants will expire worthless. Thus, it will cost Classes 1 through 11 nothing. If, as is likely, the proponent's forecasts are excessively pessimistic, then the New Preferred Warrants would provide a fair payoff to the preferred shareholders.

### Opposition to Issuing New Preferred Warrants to the Preferred Shareholders Would Be Evidence That the Proponents Don't Believe Their Own Numbers.

39. I am hoping that the other parties to this case see the wisdom and fairness of these arguments. However, it would be natural for them to have an instinctive knee-jerk reaction to oppose any changes to the plan at this seemingly late hour. I would caution the other parties that opposing the issuance of New Preferred Warrants at an exercise price of $1,609 million implies that they do not believe their own submissions on valuation and are thus willfully attempting to mislead the Court. Such willful misrepresentations alone should call for rejection of the disclosure document and the plan, let alone ethics charges against counsel. Again, if their pessimistic forecasts are correct, the New Preferred Warrants will expire worthless and thus cost the other claimants nothing.

---

[13] The phrase "strike price" and "exercise price" both refer to the same thing are generally used interchangeably in discussions of options and warrants.

40. In summary, the proposed plan is neither fair nor equitable and should therefore be rejected. The proposed disclosure document fails to communicate sufficient information regarding valuation for a reasonable party, such as the Court, to determine whether or not the proposed plan is fair and reasonable and thus should be rejected. it is quite plausible that the value of the firm's assets could be high enough to justify the granting of New Preferred Warrants to the preferred shareholders. These objections can be resolved by granting New Preferred Warrants to the preferred shareholders for 5% of the resulting company with a strike price of a total equity value of $1,609 million.

Respectfully submitted,

*[signature: James J. Angel]*

James J. Angel

Dated this 31st day of October 2022.

James J. Angel, Ph.D., CFA, CFP®
3328 Highland Ln
Fairfax VA 22031
angelj@georgetown.edu
+1 (703) 851-8575
Fax: +1 (703) 574-5656

*Pro se*