IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
F I L E D

APR 03 2023

Nathan Ochsner, Clerk of Court

| | |
|---|---|
| In re: | Chapter 11 |
| ALTERA INFRASTRUCTURE, L.P., *et. al.* 1 | Case No. 22-90130 (MI) |
| Debtors. | (Jointly Administered) |
| | RE: Docket Nos. 538, 539, 540 |

# SUPPLEMENTAL MATERIALS, BRIEFING, AND DECLARATION OF JACK W. MORRIS IN SUPPORT OF HANOVER'S OBJECTION TO DEBTOR'S OMNIBUS OBJECTION TO CERTAIN PROOFS OF CLAIM (EQUITY INTEREST CLAIMS)

Creditor The Hanover Packard Group, L.L.C. ("Hanover") files this Reply of Supplemental Materials, Briefing, and Declaration of Jack W. Morris ("Response") to Debtor Altera Infrastructure, L.P., *et. al.* ("Debtors") First Omnibus Objection to Certain Proofs of Claim (Equity Interest Claims) (the "Objection")2 and respectfully states:

---

1. A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' Claims and Noticing Agent at https://cases.stretto.com/Altera. The location of Debtor Altera Infrastructure L.P.'s principal place of business and the Debtors' service address in these chapter 11 cases is Altera House, Unit 3, Prospect Park, Prospect Road, Arnhall Business Park, Westhill, AB32 6FJ, United Kingdom.

2. Capitalized terms used but not otherwise defined herein shall have the same meaning ascribed to them in the Objection.

Page | 1    HANOVER RESPONSE TO DEBTOR'S OBJECTION

# I.
# INTRODUCTION

The Debtors' Issues of **7.25% SERIES A PREFERRED UNITS** (Registration No. 333-188051, filed on April 22, 2013), **8.50% SERIES B PREFERRED UNITS** (Registration No. 333-196098, filed on May 20, 2014), and **8.875% SERIES E PREFERRED UNITS** (Registration No. 333-221745 (as further amended) filed on November 24, 2017) (the "**PREFERRED UNITS**") were each offered to the public by a *Form F-3 Registration Statement Under The Securities Act Of 1933* (the "Registration") under guidelines and requirements of the *United States Securities and Exchange Commission* ("SEC").

Among these SEC guidelines are requirements that the financial activities of the Debtors be reported under United States Generally Accepted Accounting Principles (GAAP) maintained by the Financial Accounting Standards Board (FASB). The current single source that provides definition and guidance for GAAP reporting are known as Accounting Standards Codification (ASC).

The question before this Court, in its most simple form, asks "are the Debtors' Issues of **PREFERRED UNITS** Issues that require treatment and GAAP reporting as "equity" or as "debt" on the Financial Reports of the Debtors"?

Under GAAP, the **PREFERRED UNITS** are considered hybrid derivative instruments (contracts) that have terms and features that are both debt-like and equity-like; because of this, determining whether the **PREFERRED UNITS** are legally an equity instrument (e.g., a preferred share or unit) is not a straightforward "yes" or "no" response, and requires careful analysis and judgment.

For example, the **PREFERRED UNITS** have the following debt-like attributes:

1. Date certain Redemption provision, at a specified $25 per share Redemption value
2. Cumulative and mandatory, quarterly fixed distributions (whether or not declared by the Board)
3. Preference in liquidation
4. Non-voting rights (except after certain events of default)
5. Debt-like, Creditor protective covenants (that ultimately determined the timing of the Debtor's protective filing with this Court on 12 August 2022).

At the same time, the Registration describes the **PREFERRED UNITS** with the following equity-like attributes:

> "(the **PREFERRED UNITS**) represent perpetual equity interests in us and, unlike our indebtedness, will not give rise to a claim for payment of a principal amount at a particular date. As such, the Series A Preferred Units will rank junior to all of our indebtedness and other liabilities with respect to assets available to satisfy claims against us."

To answer the question before the Court, in non-accounting terms, the ambiguities of debt-like vs. equity-like features and attributes in the Registration creates a drama and mystery that is much like the farmer that puts lipstick on his prize sow, and calls her his queen; while it is true that she may be his queen, she is still a sow at the end of the day, and the farmer's passionate declarations and even the finest lipstick cannot change this fact.

In this same way, the Debtors are attempting to paint its **PREFERRED UNITS** with "equity" lipstick, when at the end of the day we find that the Registration reveals more debt-like features and attributes than equity.

Careful analysis and judgment, along with a detailed analysis of GAAP reporting requirements, show as that the **PREFERRED UNITS** are debt-like derivatives, and accordingly must be recognized as debt.

The Debtors inability to pay the mandatory quarterly cash distributions agreed to in each of the **PREFERRED UNITS** Issues does not eliminate the liability to make the payment; it is the mere incurring of the liability on each listed quarterly payment date that gives rise to the debt when unpaid.

The Debtors inability to pay does not make the obligation to pay optional nor does it eliminate the debt, as the Debtors imply in their Objection.

Likewise, the mandatory redemption of the **PREFERRED UNITS** (at the stated $25 per unit cash redemption value plus the amount equal to all accumulated and unpaid distributions thereon) upon the event of any liquidation, dissolution or winding up of the Debtors' affairs does not eliminate this liability due to the Debtors inability to pay.

## II.
## ACCOUNTING STANDARDS CODIFICATION 480 (ASC 480)

**A. ASC 480 determines if the PREFERRED UNITS are a Debt or an Equity or both.**

**ASC 480**, overall, provides us GAAP guidance in distinguishing Liabilities and Debt from Equity in all Financial Reports (including the Financial Reports of the Debtors); it delivers to us perspective by defining the concepts, explaining the rules, and offering clarity by demonstrating various reporting examples.

Prior to **ASC 480**, standard setters had been struggling with the proper reporting for hybrid instruments (instruments having characteristics of both liabilities and equity); the Debtors and each of their **PREFERRED UNITS** creditors in this case are struggling with the same, but have the advantage today of looking to **ASC 480** for answers.

Today **ASC 480** provides us answers for two questions in the matter before this court. First, it establishes criteria for classification for certain instruments that nominally are equity but have key characteristics of debt (the **PREFERRED UNITS**), and secondly, it develops the methodology for disaggregating the constituent parts of these compound instruments so that they may be accounted for as debt and as equity, respectively (*the mandatory quarterly cash distributions separate from the $25 per unit Redemption Price for* the **PREFERRED UNITS**).

**Scope of ASC 480**

The guidance in **ASC 480** applies to freestanding equity and equity-linked financial instruments and requires a reporting entity to classify certain freestanding financial instruments as liabilities (or in some cases as assets).

**ASC 480-10** provides detailed and specific guidance on how an issuer classifies and measures financial instruments with characteristics of both liabilities and equity.

**ASC 480-10-25-4, ASC 480-10-25-5, ASC 480-10-25-8**, and **ASC 480-10-25-14**, provide guidance on which instruments are within the scope of **ASC 480**.; one of the instruments within the scope is a mandatorily redeemable financial instrument, which is defined in **ASC 480-10-20**:

> **Definition from ASC 480-10-20:**
> Mandatorily redeemable financial instrument: Any of various financial instruments issued in the form of shares that embody an unconditional obligation requiring the issuer to redeem the instrument by transferring its assets at a specified or determinable date (or dates) or upon an event that is certain to occur.

**ASC 480-10-25-4** guidance provides this Reporting Requirement:

> **Reporting Requirement from ASC 480-10-25-4:**
> A mandatorily redeemable financial instrument shall be classified as a liability unless the redemption is required to occur only upon the liquidation or termination of the reporting entity.

**ASC 480-10-25-5** guidance provides this Reporting Rule:

> **Reporting Rule from ASC 480-10-25-5:**
> A financial instrument that embodies a conditional obligation to redeem the instrument by transferring assets upon an event not certain to occur becomes mandatorily redeemable if that event occurs, the condition is resolved, or the event becomes certain to occur.

**ASC 480-10-25-8** guidance provides this Reporting Requirement:

> **Reporting Requirement from ASC 480-10-25-8:**
> An entity shall classify as a liability (or an asset in some circumstances) any financial instrument, other than an outstanding share, that, at inception, has both of the following characteristics:
>
> a. It embodies an obligation to repurchase the issuer's equity shares, or is indexed to such an obligation.
> b. It requires or may require the issuer to settle the obligation by transferring assets.

**ASC 480-10-25-14** guidance provides this Reporting Requirement:

> **Reporting Requirement from ASC 480-10-25-14:**
> A financial instrument that embodies an unconditional obligation, or a financial instrument other than an outstanding share that embodies a conditional obligation, that the issuer must or may settle by issuing a variable number of its equity shares shall be classified as a liability (or an asset in some circumstances) if, at inception, the monetary value of the obligation is based solely or predominantly on any one of the following:
>
> a. A fixed monetary amount known at inception (for example, a payable settleable with a variable number of the issuer's equity shares)
> b. Variations in something other than the fair value of the issuer's equity shares (for example, a financial instrument indexed to the Standard and Poor's S&P 500 Index and settleable with a variable number of the issuer's equity shares)
> c. Variations inversely related to changes in the fair value of the issuer's equity shares (for example, a written put option that could be net share settled).

The ASC Master Glossary defines monetary value:

> **Definition from ASC Master Glossary:**
> Monetary value: What the fair value of the cash, shares, or other instruments that a financial instrument obligates the issuer to convey to the holder would be at the settlement date under specified market conditions.

## III.
## DOMINANT ATTRIBUTES OF THE PREFERRED UNITS' ISSUES

### A. The PREFERRED UNITS' debt-like attributes dominate the equity-like attributes:

The Debtors' Prospectus and Registration for its **7.25% SERIES A PREFERRED UNITS** (Registration No. 333-188051, filed on April 22, 2013), obligates the Debtors to make to each holder of its **PREFERRED UNITS** a mandatory quarterly cash distribution and Redemption terms, and provides certain special _Creditor Rights_ in the _events of default_ as follows:

**Document 15-3 page 21 of 105:**

"Distributions:
Distributions on Series A Preferred Units will accrue and be cumulative from the date that the Series A Preferred Units are originally issued and will be payable on each Distribution Payment Date (as defined below) when, as and if declared by the board of directors of our general partner out of legally available funds for such purpose."

"Distribution Payment Dates:
February 15, May 15, August 15 and November 15, commencing August 15, 2013 (each, a Distribution Payment Date). The initial distribution on the Series A Preferred Units will be payable on August 15, 2013."

"Distribution Rate:
The distribution rate for the Series A Preferred Units will be 7.25% per annum per $25.00 of liquidation preference per unit (equal to $1.8125 per unit)."

**Document 15-3 page 22 of 105:**

"Optional Redemption:
At any time on or after April 30, 2018, we may redeem, in whole or in part, the Series A Preferred Units at a redemption price of $25.00 per unit plus an amount equal to all accumulated and unpaid distributions thereon to the date of redemption, whether or not declared. Any such redemption would be effected only out of funds legally available for such purpose. We must provide not less than 30 days' and not more than 60 days' written notice of any such redemption.

**Document 15-3 page 22 of 105:**

"Voting Rights:
Holders of the Series A Preferred Units generally have no voting rights. However, if and whenever distributions payable on the Series A Preferred Units are in arrears for six or more quarterly periods, whether or not consecutive, holders of Series A Preferred Units (voting together as a class with all other classes or series of Parity Securities upon which like voting rights have been conferred and are exercisable) will be entitled to elect one additional director to serve on our general partner's board of directors, and the size of our general partner's board of directors will be increased as needed to accommodate such change. Distributions payable on the Series A Preferred Units will be considered to be in arrears for any quarterly period for which full cumulative distributions through the most recent distribution payment date have not been paid on all outstanding Series A Preferred Units. The right of such holders of Series A Preferred Units to elect a member of our general partner's board of directors will continue until such time as all accumulated and unpaid distributions on the Series A Preferred Units have been paid in full.

Unless we have received the affirmative vote or consent of the holders of at least twothirds of the outstanding Series A Preferred Units, voting as a single class, we may not adopt any

amendment to our partnership agreement that would have a material adverse effect on the existing terms of the Series A Preferred Units.

In addition, unless we have received the affirmative vote or consent of the holders of at least two-thirds of the outstanding Series A Preferred Units, voting as a class together with holders of any other Parity Securities upon which like voting rights have been conferred and are exercisable, we may not (i) issue any Parity Securities if the cumulative distributions on Series A Preferred Units are in arrears or (ii) create or issue any Senior Securities."

### Document 15-3 page 23 of 105:
"Fixed Liquidation Price:
In the event of any liquidation, dissolution or winding up of our affairs, whether voluntary or involuntary, holders of the Series A Preferred Units will have the right to receive the liquidation preference of $25.00 per unit plus an amount equal to all accumulated and unpaid distributions thereon to the date of payment, whether or not declared, before any payments are made to holders of our common units or any other Junior Securities. A consolidation or merger of us with or into any other entity, individually or in a series of transactions, will not be deemed to be a liquidation, dissolution or winding up of our affairs."

### B. The PREFERRED UNITS' debt-like attributes dominate the equity-like attributes:

The Debtors' Prospectus and Registration for its **8.50% SERIES B PREFERRED UNITS** (Registration No. 333-196098, filed on May 20, 2014), obligates the Debtors to make to each holder of its **PREFERRED UNITS** a mandatory quarterly cash distribution and Redemption terms, and provides certain special _Creditor Rights_ in the _events of default_ as follows:

### Document 15-6 page 25 of 119:
"Distributions on Series B Preferred Units will accrue and be
cumulative from the date that the Series B Preferred Units are
originally issued and will be payable on each Distribution Payment
Date (as defined below) when, as and if declared by the board of
directors of our general partner out of legally available funds for such purpose."

"Distribution Payment Dates:
February 15, May 15, August 15 and November 15, commencing on
August 15, 2015 (each, a Distribution Payment Date)."

"Distribution Rate:
The distribution rate for the Series B Preferred Units will be 8.50%
per annum per $25.00 of liquidation preference per unit (equal to $2.125 per unit)."

### Document 15-6 page 26 of 119:
"Optional Redemption:

At any time on or after April 20, 2020, we may redeem, in whole or in part, the Series B Preferred Units at a redemption price of $25.00 per unit plus an amount equal to all accumulated and unpaid distributions thereon to the date of redemption, whether or not declared. Any such redemption would be effected only out of funds legally available for such purpose. We must provide not less than 30 days' and not more than 60 days' written notice of any such redemption.

**Document 15-6 page 26-27 of 119**
"Voting Rights:
Holders of the Series B Preferred Units generally have no voting rights. However, if and whenever distributions payable on the Series B Preferred Units are in arrears for six or more quarterly periods, whether or not consecutive, holders of Series B Preferred Units (voting together as a class with all other classes or series of Parity Securities upon which like voting rights have been conferred and are exercisable, including holders of our Series A Preferred Units) will be entitled to elect one additional director to serve on our general partner's board of directors, and the size of our general partner's board of directors will be increased as needed to accommodate such change (unless the holders of Series B Preferred Units and Parity Securities upon which like voting rights have been conferred, voting as a class, have previously elected a member of our general partner's board of directors, and such director continues then to serve on the board of directors). Distributions payable on the Series B Preferred Units will be considered to be in arrears for any quarterly period for which full cumulative distributions through the most recent distribution payment date have not been paid on all outstanding Series B Preferred Units. The right of such holders of Series B Preferred Units to elect a member of our general partner's board of directors will continue until such time as all accumulated and unpaid distributions on the Series B Preferred Units have been paid in full.

Unless we have received the affirmative vote or consent of the holders of at least two-thirds of the outstanding Series B Preferred Units, voting as a single class, we may not adopt any amendment to our partnership agreement that would have a material adverse effect on the existing terms of the Series B Preferred Units.

In addition, unless we have received the affirmative vote or consent of the holders of at least two-thirds of the outstanding Series B Preferred Units, voting as a class together with holders of any other Parity Securities upon which like voting rights have been conferred and are exercisable (including holders of our Series A Preferred Units), we may not (i) issue any Parity Securities if the cumulative distributions on Series A Preferred Units or Series B Preferred Units are in arrears or (ii) create or issue any Senior Securities."

**Document 15-6 page 27 of 119**
"Fixed Liquidation Price
In the event of any liquidation, dissolution or winding up of our affairs, whether voluntary or involuntary, holders of the Series B Preferred Units will have the right to receive the liquidation preference of $25.00 per unit plus an amount equal to all accumulated and unpaid distributions thereon to the date of payment, whether or not declared, before any payments are made to holders of our common units or any other Junior Securities. A consolidation or merger of us with or into any other entity, individually or in a series of transactions, will not be deemed to be a liquidation, dissolution or winding up of our affairs."

### C. The PREFERRED UNITS' debt-like attributes dominate the equity-like attributes:

The Debtors' Prospectus and Registration for its **8.875% SERIES E PREFERRED UNITS** (Registration No. 333-221745 (as further amended) filed on November 24, 2017), obligates the Debtors to make to each holder of its **PREFERRED UNITS** a mandatory quarterly cash distribution and Redemption terms as follows:

**Document 15-9 page 24 of 177:**
"Distributions on Series E Preferred Units will accrue and be cumulative from the date that the Series E Preferred Units are originally issued and will be payable on each Distribution Payment Date (as defined below) when, as and if declared by the board of directors of our general partner out of legally available funds for such purpose."

"Distribution Payment Dates:
February 15, May 15, August 15 and November 15 (each, a Distribution Payment Date) to the holders of record as of the close of business on the fifth Business Day immediately preceding the Distribution Payment Date. The initial distribution on the Series E Preferred Units will be payable on May 15, 2018. The initial distribution on the Series E Preferred Units offered hereby will be payable on May 15, 2018 in an amount equal to $0.69028 per unit."

"Distribution Rate:
From and including the original issue date to, but not including, February 15, 2025, the distribution rate for the Series E Preferred Units will be 8.875% per annum per $25.00 of the liquidation preference per unit (equal to $2.21875 per unit per annum). From and including February 15, 2025, the distribution rate will be a floating rate equal to three-month LIBOR plus a spread of 640.7 basis points per annum per $25.00 of liquidation preference per unit."

**Document 15-9 page 24 of 177:**
"Distribution Calculation:
Distributions payable on the Series E Preferred Units for any distribution period during the fixed rate period will be calculated based on a 360-day year consisting of twelve 30-day months. Distributions payable on the Series E Preferred Units for any distribution period during the

floating rate period will be calculated based on a 360-day year and the number of days actually elapsed during the applicable distribution period."

### Document 15-9 page 26 of 177:
"Optional Redemption:
At any time on or after February 15, 2025, we may redeem, in whole or in part, the Series E Preferred Units at a redemption price of $25.00 per unit plus an amount equal to all accumulated and unpaid distributions thereon to the date of redemption, whether or not declared. Any such redemption would be effected only out of funds legally available for such purpose. We must provide not less than 30 days' and not more than 60 days' written notice of any such redemption."

### Document 15-9 page 26-27 of 177:
"Voting Rights:
Holders of the Series E Preferred Units generally have no voting rights. However, if and whenever distributions payable on the Series E Preferred Units are in arrears for six or more quarterly periods, whether or not consecutive, holders of Series E Preferred Units (voting together as a class with all other classes or series of Parity Securities upon which like voting rights have been conferred and are exercisable, including holders of our Series A Preferred Units and Series B Preferred Units) will be entitled to elect one additional director to serve on our general partner's board of directors, and the size of our general partner's board of directors will be increased as needed to accommodate such change (unless the holders of Series E Preferred Units and Parity Securities upon which like voting rights have been conferred, voting as a class, have previously elected a member of our general partner's board of directors, and such director continues then to serve on the board of directors). Distributions payable on the Series E Preferred Units will be considered to be in arrears for any quarterly period for which full cumulative distributions through the most recent distribution payment date have not been paid on all outstanding Series E Preferred Units. The right of such holders of Series E Preferred Units to elect a member of our general partner's board of directors will continue until such time as all accumulated and unpaid distributions on the Series E Preferred Units have been paid in full.

Unless we have received the affirmative vote or consent of the holders of at least two-thirds of the outstanding Series E Preferred Units, voting as a single class, we may not adopt any amendment to our partnership agreement that would have a material adverse effect on the existing terms of the Series E Preferred Units.

In addition, unless we have received the affirmative vote or consent of the holders of at least two-thirds of the outstanding Series E Preferred Units, voting as a class together with holders of any other Parity Securities upon which like voting rights have been conferred and are exercisable (including holders of our Series A Preferred Units and Series B Preferred Units), we may not (i) issue any Parity Securities if the cumulative distributions on Series A Preferred Units, Series B Preferred Units or Series E Preferred Units are in arrears or (ii) create or issue any Senior Securities."

**Document 15-9 page 27 of 177:**

"Fixed Liquidation Price:

In the event of any liquidation, dissolution or winding up of our affairs, whether voluntary or involuntary, holders of the Series E Preferred Units will have the right to receive the liquidation preference of $25.00 per unit plus an amount equal to all accumulated and unpaid distributions thereon to the date of payment, whether or not declared, before any payments are made to holders of our common units or any other Junior Securities. A consolidation or merger of us with or into any other entity, individually or in a series of transactions, will not be deemed to be a liquidation, dissolution or winding up of our affairs."

## IV.
## DEBTORS FAIL TO RAISE ANY OF THE ASC 480 GUIDANCE, RULES AND REPORTING REQUIREMENTS IN THE OBJECTION

**A. The Debtors failed to address GAAP Reporting Requirements and did not enumerate any ASC 480 guidance in the Objection.**

The Debtors' Objection is defective and fails to address the GAAP Reporting Requirements that determine the rules and judgment needed to properly classify the **PREFERRED UNITS** as debt or equity or both; for this reason alone the Court must deny the Objection.

**B. The predominant material facts and attributes of the Debtors' PREFERRED UNITS are more debt-like than equity-like.**

The mandatory and agreed to quarterly cash distributions of the **PREFERRED UNITS** began to accrue at the date of each issue and are also cumulative from each original issue date, when, as and if declared by the board of directors, and whether or not the Debtors have the ability to fund the distributions. **ASC 480** guidance specifies that the cash distributions are embodied and unconditional components of the **PREFERRED UNITS** that require the Debtors to transfer its assets to satisfy the obligation(s) at the specified date(s) and for the specified amount(s). **ASC 480-10-20** determines the cash distribution component(s) meet the definition of "mandatorily redeemable" and **ASC 480-10-25-4** guidance provides the (Debtors) Reporting Requirement that a mandatorily redeemable financial instrument shall be classified as a liability. For this reason, the Debtors' Objection is defective and must be denied.

On July 29, 2021 the Debtors announced pre-Petition protective measures in an international press release (see Exhibit A attached). The press release announces the suspension of the quarterly cash distributions of the **PREFERRED UNITS** and proclaims:

> "The measures we are announcing today are expected to significantly extend our debt maturity profile, improve the Partnership's cash flows and enhance its overall financial flexibility,"

Out of the Debtors own mouth, we hear that the quarterly cash distributions are a debt; conversely, we can reasonably conclude that the Debtors would not make this statement if the cash distributions were equity. For this reason, the Debtors' Objection is defective and must be denied.

July 29, 2021 is also a significant and material event under **ASC 480** guidance as it is the first publicly proclaimed event of default on the **PREFERRED UNITS** and triggers the protective creditor covenants embodied in each Registration. Specifically we learn that the first date of default on each (of the) debt obligation(s) is with respect to the distribution period of May 15, 2021 to August 14, 2021. This is significant on many fronts, because after the 6th payment default (15 November 2022) the Debtors are obligated to allow and the **PREFERRED UNITS** owners are entitled to act as an aggregate class to elect one additional director to serve on the general partner's board of directors, and the size of the general partner's board of directors will be increased as needed to accommodate such change.

Additional Creditor protective covenants then require the Debtors to receive affirmative vote or consent of the holders of at least two-thirds of the outstanding **PREFERRED UNITS**, voting as a single class, in order to adopt any amendment to the Debtors partnership agreement that would have a material adverse effect on the existing terms of the **PREFERRED UNITS**.

It is reasonable to conclude that the Debtors escalated their pre-petition protective measures and elected to file the 12 August 2022 Reorganization in order to avoid the effective implementation of these **PREFERRED UNITS'** protective creditor covenants, and that likely would have blocked the strong-armed self-serving actions in the Brookfield transaction.

Lastly, **ASC 480** guidance additionally specifies that the attributes of (a) Preference in liquidation (b) non-voting rights (prior to certain acts of default) and (c) the passing of conditional dates or events that trigger Redemption at the pre-determined value(s) are debt-like attributes and must be taken into consideration when determining if the instrument is to be classified as debt or as equity. These attributes may seem insignificant when viewed as isolated attributes, but when aggregating as an entire body of evidence, judgment requires every aspect of the **PREFERRED UNITS** to be classified as debt.

For this reason, the Debtors' Objection is defective and must be denied.

## V.
## <u>DECLARATION OF JACK W. MORRIS</u>
## <u>IN SUPPORT OF HANOVER'S OBJECTION TO DEBTOR'S OMNIBUS OBJECTION TO CERTAIN PROOFS OF CLAIM (EQUITY INTEREST CLAIMS)</u>

I, Jack w. Morris, hereby declare under penalty of perjury:

1. I am the Managing Member and Director of Hanover.  On behalf of Hanover, I filed a Proof of Claim on 2 November 2022 against the above-captioned Debtors. Hanover is the owner of the following Preferred positions at the time of the filing of the Debtors Bankruptcy Petition on 12 August 2022:

ALTERA INFRASTRUCTURE LP 7.25% Series A Cumulative Redeemable Preferred Units—7,750 units

ALTERA INFRASTRUCTURE LP 8.50% Series B Cumulative Redeemable Preferred Units—9,950 units

ALTERA INFRASTRUCTURE LP 8.875% Series E Cumulative Redeemable Preferred Units—9,600 units

2. I have read the Debtors' Objection to Certain Proofs of Claim (Equity Interest Claims).

3. To the best of my knowledge, information, and belief, and for the reasons stated in this briefing, the disallowance of the "Equity Interest Claims" on the terms set forth and reasons given in the Objection is _not_ appropriate and provides and unjust, unfair benefit to the Debtors and that they are not entitled to.  The Debtors' **PREFERRED UNITS** when analyzed with **ASC 480** guidance and together with the Debtors' own admissions, evidence the fact they are in a legal class entirely separate from the Debtors' common stock issue, and designed to mirror the benefit and attributes of bond issues. Judgment and **ASC 480** guidance each dictate that the **PREFERRED UNITS** are debt instruments.

4. The Debtors have acknowledged in their Petition and prior Financial Reporting obligations that the **PREFERRED UNITS** include a mandatory obligation to pay date and sum certain cash distributions to all unitholders. Except in the Objection, the Debtors _never argue that these obligations are equity and not debt_.

5. In contrast, the Debtors do not have, nor have they ever had, any obligation to pay any dividend of any amount (or any dividend at all) to common unit holders.

6. The Debtors cannot have it both ways; they cannot enjoy the benefit of access to the bond and investment markets with a product that looks like, smells like, and is treated similarly as a bond is, with contractual obligations to pay legal sums and amounts certain on specified payment dates, while at the same time, claiming in its Petition that it is seeking relief from this same payment obligations based on the assertion that it is an "Equity Interest Claim".

7. The Hanover Proof of Claim filed on 2 November 2022 against the Debtors included $56,490.63 in accrued and unpaid cash distributions, and $682,500.00 for the pre-determined, agreed to redemption values (at $25.00 per unit), due and payable as of the date of the filing of the Petition.

8. I believe that the allowance of the Objection, on the terms set forth in the Objection and Schedule 1 to the Order is not appropriate, and is to the unjust detriment of the Creditors and an unjust and unfair benefit to the Debtors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the facts set forth in the foregoing declaration are true and correct to the best of my knowledge, information and belief as of the date hereof, 23 January 2023.

*/s/ Jack W. Morris*

THE HANOVER PACKARD GROUP, LLC
By: Jack W. Morris
its: Managing Member/Director

**EXHIBIT "A"**



# Altera Infrastructure GP LLC Announces Series of Measures Which Are Expected to Result in More Than $80 Million in Annual Cashflow Savings, Including Suspension of Quarterly Cash Distributions on the Preferred Units of Altera Infrastructure L.P. and Commitment from Brookfield to Extend Approximately $700 million in Indebtedness to 2026

July 29, 2021 02:46 ET | Source: **Altera Infrastructure L.P.**

ABERDEEN, United Kingdom, July 29, 2021 (GLOBE NEWSWIRE) -- The board of directors of Altera Infrastructure GP LLC (*Altera GP*), the general partner of Altera Infrastructure L.P. (*Altera* or *the Partnership*), today announced a series of measures to improve the Partnership's maturity profile and enhance its liquidity and financial flexibility. As part of these measures, the Partnership has taken the following actions:

- Entered into an agreement with Brookfield Business Partners L.P., and certain of its affiliates and institutional partners (collectively, "Brookfield") to exchange at par approximately $700 million of indebtedness in Altera GP with maturities ranging from 2022 to 2024 (including $411 million of Altera's 8.5% Senior Notes due 2023 (the "Notes") held by Brookfield) for 11.5% Senior Secured PIK Notes due 2026 and commenced an exchange transaction relating to the $276 million of Notes held by non-Brookfield parties.

- Suspended the payment of quarterly cash distributions on the Partnership's outstanding 7.25% Series A Cumulative Redeemable Preferred Units (the "Series A Units"), 8.50% Series B Cumulative Redeemable Preferred Units (the "Series B Units") and 8.875% Series E Fixed-to-Floating Rate Cumulative Redeemable Perpetual Preferred Units (the "Series E Units" and, together with the Series A Units and Series B Units, the "Preferred Units") commencing with the distributions payable with respect to the period of May 15, 2021 to August 14, 2021. All distributions on the Preferred Units will continue to accrue and must be paid in full before distributions to Class A and Class B common unitholders can be made. No distributions on the Preferred Units will be permitted without noteholder consent while the new PIK notes issued in the exchange transactions described above remain outstanding.

"The measures we are announcing today are expected to significantly extend our debt maturity profile, improve the Partnership's cash flows and enhance its overall financial flexibility," commented Ingvild Sæther, President and CEO of Altera Infrastructure Group Ltd. "Our Board of Directors has carefully assessed a number of different options to enhance our liquidity and maintain a strong cost focus. With the support of Brookfield, we believe these actions put the company on stronger footing to support its existing operations, including opportunities to secure new contracts."

The Partnership expects to achieve in excess of $80 million in annual cashflow savings as a result of the agreement with Brookfield and suspension of quarterly distributions on the Preferred Units. In addition, there is potential for further annual cashflow savings depending on the outcome of the exchange of the Notes held by non-Brookfield parties. If all of the Notes are exchanged in the exchange transactions, which remain subject to the satisfaction of certain conditions, these measures will also extend maturities currently ranging from 2022 to 2024 on approximately $970 million of indebtedness to 2026, including indebtedness held by Brookfield.

**About the Partnership**

The Partnership is a leading global energy infrastructure services partnership primarily focused on the ownership and operation of critical infrastructure assets in the offshore oil regions of the North Sea, Brazil and the East Coast of Canada. The Partnership has

consolidated assets of approximately $4.3 billion, comprised of 47 vessels, including floating production, storage and offloading units, shuttle tankers (including one newbuilding), floating storage and offtake units, long-distance towing and offshore installation vessels and a unit for maintenance and safety. The majority of Altera's fleet is employed on medium-term, stable contracts.

The Series A Units, Series B Units and Series E Units trade on the New York Stock Exchange under the symbols "ALIN PR A" "ALIN PR B" and "ALIN PR E," respectively.

**For further information contact:**
Jan Rune Steinsland,
Chief Financial Officer

Tel: +47 97 05 25 33
E-mail: investor.relations@alterainfra.com